**KECK, MAHIN & CATE, GRANT COOK, and Robert A. Plessala, Petitioners,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Respondent,**

v.

**Insurance Company of North America, Respondent.**

No. 98–0034.

Supreme Court of Texas.

Argued Jan. 5, 2000.

Decided May 25, 2000.

William Key Wilde, Tracie J. Renfroe, Deborah E. Rank, Houston, for Petitioners.

Curtis J. Kurhajec, Austin, Iris H. Robinson, Kevin D. Jewell, Houston, Robert B. Summers, Austin, C. Mark Stratton, Houston, for Respondent.

Chief Justice PHILLIPS delivered the opinion of the Court in which Justice ENOCH, Justice OWEN, Justice BAKER, Justice ABBOTT, Justice HANKINSON, Justice O'NEILL and Justice GONZALES joined.

Following the settlement of a third-party liability claim, the excess insurance carrier, as the insured's equitable subrogee sued the primary insurance carrier and the attorneys the primary insurer hired to defend the insured. The excess carrier alleged that it had been forced to settle the third-party claim for too much because the attorneys and primary carrier had mishandled the insured's defense. We consider two primary issues: (1) whether a release agreement, executed between the insured and its attorneys during the attorney-client relationship, bars the insurance carriers' equitable subrogation claims for legal malpractice; and (2) whether the primary carrier and attorneys may assert the excess carrier's own negligence in settling the third-party claim as an affirmative defense to the excess carrier's equitable subrogation claim. We conclude that the release agreement is not a complete bar. We further conclude that appropriate allegations of negligence or misconduct against the excess carrier may be asserted in defense to that carrier's equitable subrogation claim. Although we do not agree in all respects with the court of appeals' reasoning, we conclude that its judgment is correct, and we affirm it. 955 S.W.2d 120.

## I. Procedural History

In September 1991, Wolf Point Shrimp Farm and its owner sued Granada Food Corporation for damages allegedly caused by Granada's improper processing and marketing of shrimp grown and harvested at Wolf Point the previous fall. Granada immediately hired the law firm of Keck, Mahin & Cate (KMC) as its attorneys in the suit. Shortly thereafter, KMC tendered the defense of the suit to Granada's primary insurance carrier, Insurance Company of North America (INA), and Granada's excess insurance carrier, National Union Fire Insurance Company of Pittsburgh, Pa. (National). INA's primary policy for the relevant period provided a limit of $1 million per occurrence. National's commercial umbrella policy provided an additional $9 million in excess coverage.

INA agreed to defend Granada under a reservation of right to contest coverage. Granada, which under the INA policy had the right to select its own defense counsel, chose to keep KMC. INA therefore formally engaged KMC to defend Granada in the Wolf Point litigation, with Grant Cook and Robert A. Plessala assuming primary responsibility for the defense. The excess policy did not require National to investigate or defend claims against Granada as long as another underlying insurance carrier was providing a defense. While National did have the right to associate in the defense and trial of any claim it deemed a threat to its liability, it did not exercise that right in the Wolf Point litigation.

During the litigation, Wolf Point demanded $3.6 million to settle the suit. Both INA and National were informed of the demand, but neither insurer expressed interest in settling for this amount, and KMC advised that the case could probably be settled for less than half this sum.

In January 1992, the trial court gave the Wolf Point litigation a preferential trial setting for April 28, 1992. KMC's efforts to continue the setting were unsuccessful, and the case proceeded to trial. On the first day of trial, INA tendered its policy limits to National. Two days later, National settled the suit for $7 million, and a final judgment was later signed for that amount.

Less than two years later, National filed this suit against INA and KMC to recover the money it paid to settle the Wolf Point suit. National alleged that INA and the attorneys had mishandled Granada's defense, forcing National to settle the third-party claim to protect both Granada and

itself from an excess judgment. National's claims against INA included allegations of negligence, gross negligence and violations of the Texas Insurance Code, and its claim against KMC was for legal malpractice. Because all of these claims belonged to the insured, National asserted them under the doctrine of equitable subrogation.

INA denied responsibility and asserted a cross-claim against KMC for malpractice and an affirmative defense against National, based on the excess carrier's contributory negligence or comparative responsibility. KMC also denied responsibility and affirmatively pled that a release agreement between it and the insured barred National's and INA's claims. KMC additionally asserted affirmative defenses of contributory negligence and comparative responsibility against National. All parties filed motions for summary judgment.

The trial court's rulings on these motions eliminated for trial all but National's negligence claim against INA. The trial court granted summary judgment for KMC on the two insurance carriers' subrogation claims for malpractice because of the KMC-Granada release agreement. The trial court also granted partial summary judgment for National, rejecting INA's and KMC's affirmative defenses of contributory negligence and comparative responsibility. Finally, the trial court granted INA a partial summary judgment, eliminating National's claims of gross negligence and Insurance Code violations. After resolving these motions, the trial court severed National's and INA's claims against KMC, assigned these claims a new cause number, and rendered a final judgment that the two insurers take nothing against KMC. National and INA appealed.

The court of appeals affirmed in part,[1] reversed in part, and remanded the cause to the trial court. 955 S.W.2d 120. Con-

cluding that the Granada–KMC release was not a bar to the insurance carriers' malpractice claims, the court reversed the take-nothing summary judgment and remanded these claims to the trial court. The court also reversed the trial court's ruling on National's motion for summary judgment, holding that KMC and INA could raise National's comparative responsibility as a defense. The court, however, limited the relevant time period for proving this defense to National's conduct after INA's tender of the primary policy limits. Because we agree that these claims must be remanded to the trial court for further proceedings, we affirm the court of appeals' judgment. We agree that KMC and INA can raise National's comparative responsibility in defense to the respective negligence claims against them. We further agree that KMC was not entitled to summary judgment on the release, although we disagree with how the court of appeals construed that agreement.

## II. The Release

KMC and Granada signed the release on April 10, 1992, a little more than two weeks before the Wolf Point trial was to begin. According to KMC, Granada owed it a substantial sum for past legal services unrelated to Wolf Point and wanted to clear that debt from its balance sheet. Thus, in exchange for KMC's promise to forgive these unpaid fees, Granada released KMC from "all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter, directly or indirectly attributable to the rendition [of] professional legal services by KMC to Granada between June 1, 1988 and April 1, 1992." The trial court concluded that the release of "all demands, claims or causes of action" was broad enough to cover the Wolf Point liti-

1. The court of appeals agreed that INA was entitled to summary judgment on National's claims of gross negligence and violation of the Insurance Code because National's theory of equitable subrogation limited it solely to in-

demnification. 955 S.W.2d at 133. National has not appealed that part of the court's opinion and judgment, and that issue is not before us.

gation. The court of appeals construed the release more narrowly, however, concluding that the parties' intention "in entering into this release was to resolve the issue of unpaid fees, not to release KMC from any and all legal malpractice claims." 955 S.W.2d at 129. Because INA, not Granada, was paying for the Wolf Point defense, the court of appeals concluded that it was not included within the release.

### A. Scope of the Release

KMC complains that the court of appeals erroneously implies "unpaid fees" as a limitation on its consideration under the release. KMC submits that its consideration for the agreement is set forth in paragraph 2 which, in plain language, releases any and all claims Granada may have against KMC directly or indirectly attributable to KMC legal services between June 1, 1988 and April 1, 1992. Unpaid legal fees are not mentioned.

Unpaid fees are only mentioned in the recitals at the beginning of the agreement and again in the first numbered paragraph which sets out Granada's consideration for the release. The agreement begins:

WHEREAS, KMC has performed legal services for Granada since June of 1988;

WHEREAS, as of the date written above, Granada owes KMC a substantial sum for outstanding and unpaid invoices for professional legal services rendered to Granada up to April 1, 1992 (the "Unpaid Fees");

WHEREAS, KMC and Granada desire to resolve the issue of the Unpaid Fees to their mutual satisfaction; and

WHEREAS, KMC has advised Granada in writing that independent representation is appropriate in connection with the execution of this Agreement.

NOW, THEREFORE, in exchange for the mutual promises, agreements and releases herein contained, KMC and Granada do hereby agree as follows:

\* \* \*

Paragraphs 1 and 2 immediately follow and set out the consideration to Granada and to KMC for the agreement. In paragraph 1, KMC forgives Granada for all unpaid legal fees for services rendered between June 1, 1988 and April 1, 1992:

1. KMC hereby releases, and by these presents does hereby release, acquit and forever discharge Granada, its agents, servants, employees, officers, directors, affiliates and all persons, natural or corporate, in privity with them or any of them from any demands, claims or causes of action of any kind which KMC had or might have, directly or indirectly attributable to the Unpaid Fees owed to KMC by Granada for professional legal services rendered between June 1, 1988 and April 1, 1992, it being intended to release Granada from any obligation to pay such Unpaid Fees.

Then in paragraph 2, Granada releases all claims it has, or may have, against KMC in connection with KMC's legal services to Granada during the same time period:

2. Granada hereby releases and by these presents does hereby release, acquit and forever discharge KMC, its agents, servants, employees, partners, affiliates and all persons, natural or corporate, in privity with it, from any and all demands, claims or causes of action of any kind whatsoever, statutory, at common law or otherwise, now existing or that might arise hereafter, directly or indirectly attributable to the rendition or [sic] professional legal services by KMC to Granada between June 1, 1988 and April 1 1992.

The court of appeals thus reads the "unpaid fees" mentioned in the recitals and paragraph 1 as an implied limitation on the claims mentioned in paragraph 2. KMC sees no reason to imply this limitation. But the court of appeals relies on our holding in *Victoria Bank and Trust Co. v. Brady,* 811 S.W.2d 931 (Tex.1991), to read the release narrowly. In *Brady,* we said that a releasing instrument must mention

the claim to be released to be effective. *Id.* at 938.

Because the release agreement here did not mention the Wolf Point claim, the court concluded it should be applied only to those claims which were mentioned; i.e. those claims involving unpaid fees. 955 S.W.2d at 129.

■ We conclude that our decision in *Brady* does not control the construction of this release. The agreement in *Brady* purported to release all claims attributable to a specific loan transaction between a bank and its customer. In subsequent litigation between these parties, the customer raised claims relating to another transaction with the bank, and the bank raised the release in defense. In rejecting the bank's defense, we noted that the parties' agreement plainly limited itself to the specific loan and thus did not cover this other transaction. *Id.* at 939. The present release is clearly broader than the one in *Brady.* It is not expressly limited to a specific claim or transaction but rather purports to cover "all demands, claims or causes of action of any kind whatsoever." Nothing in *Brady* forbids such a broad-form release. *Brady* simply holds that the release must "mention" the claim to be effective. *Id. at* 938. It does not require that the parties anticipate and identify each potential cause of action relating to the release's subject matter. *See Memorial Med. Center v. Keszler,* 943 S.W.2d 433, 435 (Tex.1997). Although releases often consider claims existing at the time of execution, a valid release may encompass unknown claims and damages that develop in the future. *See Cannon v. Pearson,* 383 S.W.2d 565, 570 (Tex.1964); *Quebe v. Gulf, C. & S.F. Ry.,* 98 Tex. 6, 81 S.W. 20, 22 (1904).

Thus, we conclude that this release was sufficient to forgive all claims against KMC for malpractice attributable to legal services rendered to Granada "between

June 1, 1988 and April 1, 1992." Although the release does not identify specific cases, it does expressly forgive Granada's existing debt to KMC for legal services rendered from June 1, 1988 to April 1, 1992 in return for Granada's release of all present and future claims attributable to KMC's legal work during this same period. The court of appeals' construction imposes a symmetry that is simply absent from the agreement's language. While the recitals in this release are concerned primarily with the issue of Granada's unpaid legal fees, they do not convey an intent to limit the consideration to KMC for the forgiveness of those fees. The recitals merely state the parties' general desire "to resolve the issue of Unpaid Fees to their mutual satisfaction." Paragraphs 1 and 2 then explain the parties' mutual satisfaction—KMC forgives all unpaid legal bills; Granada releases all claims relating to KMC's legal services rendered during a specific time period. Because the release forgives KMC for any legal malpractice it may have committed during this period, the court of appeals erred in holding to the contrary.

Nevertheless, we do not agree with KMC that this release completely bars National's and INA's claims.[2] The release does not apply to "claims of causes or action ... directly or indirectly attributable to the rendition [of] professional legal services by KMC to Granada" after April 1, 1992. Because the Wolf Point trial did not begin until April 28, 1992, and KMC's representation continued through trial, the plain terms of the release do not bar National's or INA's malpractice claims based solely on services KMC rendered after April 1, 1992. Thus, while the release may bar proof of certain elements of National's malpractice claim, it may not bar other elements.

### B. Validity of the Release

As Granada's equitable subrogee, National also challenges the validity of this

---

2. We assume, without deciding, that Granada's agreement with KMC could affect National's and INA's respective rights against

KMC because neither insurance carrier argues differently in this Court.

release. The court of appeals did not reach this issue because of its view that the release covered only KMC's "unpaid" legal work. 955 S.W.2d at 129. Because we disagree with that view, we consider this additional challenge.

National contends that the trial court erred in enforcing the release because Granada did not understand the agreement and was not fully informed before signing it. Alternatively, National argues that if Granada intended to release the Wolf Point claim, the agreement is a sham. At the very least, National submits, there are fact questions about whether the release was negotiated at arms length and in good faith. National urges that the summary judgment for KMC was erroneous under either argument.

▉▉▉ Contracts between attorneys and their clients negotiated during the existence of the attorney-client relationship are closely scrutinized. *See Archer v. Griffith,* 390 S.W.2d 735, 739 (Tex.1964). Because the relationship is fiduciary in nature, there is a presumption of unfairness or invalidity attaching to such contracts.[3] *See Ames v. Putz,* 495 S.W.2d 581, 583 (Tex.Civ.App.—Eastland 1973, writ ref'd). Further, our disciplinary rules forbid an attorney from making an agreement that prospectively limits the attorney's malpractice liability to the client unless (1) the agreement is permitted by law, and (2) the client is independently represented in making the agreement. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(g). KMC maintains that its conduct can withstand this scrutiny, but it also argues that National waived this issue by failing at any time to plead it in the trial court. *See* TEX.R. CIV. P. 94. We disagree. By raising the issue of the release's validity in its response to KMC's motion for summary judgment, National preserved the issue for appeal. *See In re B.I.V.,* 870 S.W.2d 12,

13 (Tex.1994); *Womack v. Allstate Ins. Co.,* 156 Tex. 467, 296 S.W.2d 233, 237 (1956).

▉▉▉ KMC had the burden on summary judgment to prove that the release agreement it negotiated with Granada was fair and reasonable. *See Archer,* 390 S.W.2d at 739; *see also Willis v. Maverick,* 760 S.W.2d 642, 646 (Tex.1988); *Texas Bank & Trust v. Moore,* 595 S.W.2d 502, 508–09 (Tex.1980); *International Bankers Life Ins. Co. v. Holloway,* 368 S.W.2d 567, 576 (Tex.1963); *Thigpen v. Locke,* 363 S.W.2d 247, 252 (Tex.1962); *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 261 (1951); *Cooper v. Lee,* 75 Tex. 114, 12 S.W. 483, 486 (Tex.1889). Further, it was KMC's burden as a fiduciary to establish that Granada was informed of all material facts relating to the release. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 175 (Tex.1997)(citing *Johnson v. Peckham,* 132 Tex. 148, 120 S.W.2d 786, 788 (1938))(fiduciary duty requires full disclosure of all important information). The present summary judgment record does not establish the state of Granada's information or that the agreement was fair and reasonable. The only evidence that KMC identifies is a recitation in the release that KMC "advised Granada in writing that independent representation [would be] appropriate in connection with the execution of this Agreement." This bare recitation is not sufficient to rebut the "presumption of unfairness or invalidity attaching to the contract." *Archer,* 390 S.W.2d at 739; *see also Ames,* 495 S.W.2d at 583. Accordingly, KMC has not carried its summary judgment burden. Because KMC has not established that the release agreement is a complete defense to National's and INA's equitable subrogation claim, we next consider if any other defenses are available to KMC.

---

**3.** The presumption applies in this case because the release was negotiated during KMC's representation of Granada. Conversely, had Granada severed the attorney-client relationship with KMC and hired new attorneys before agreeing to the release, the presumption would not have arisen.

### III. Equitable Subrogation

In *American Centennial Insurance Co. v. Canal Insurance Co.*, 843 S.W.2d 480 (Tex.1992), we recognized an excess insurer's right to assert a legal malpractice claim against the insured's defense attorney through equitable subrogation. Although Texas law does not permit a non-client to sue an attorney for malpractice, we reasoned that permitting an excess carrier to stand in the shoes of its insured and assert the insured's claims would not burden the existing attorney-client relationship with additional duties or create potential conflicts of interest for the attorney. *Id.* at 484. "Subrogation permits the insurer only to enforce existing duties of defense counsel to the insured." *Id.* In a concurring opinion, a majority of the Court in *Canal* also stated that the defendant to the equitable subrogation claim, whether the primary carrier or an attorney, should "have any defense available against either the insured or the excess carrier, including the excess carrier's unreasonable refusal to cooperate in the defense and settlement of the action." *Id.* at 486 (Hecht, J. concurring).

In this case, KMC and INA claim that National's own negligence caused it to settle the third-party claim against Granada for more than it otherwise would have. Relying on the concurring majority's observation in *Canal*, KMC and INA argue that the fact finder should consider National's alleged negligence in apportioning responsibility for Granada's allegedly mishandled defense. While the court of appeals agreed that KMC and INA could assert National's contributory negligence or comparative fault against National, it concluded that National had no duty to act, and thus could not itself have been negligent, until after the primary carrier tendered or exhausted its policy limits. The court accordingly limited proof of National's negligence to conduct after INA tendered its policy limits on April 28. 955 S.W.2d at 138. Both KMC and INA complain of that limitation here.

### A. Excess Carrier's Duty to Defend

KMC argues that the finder of fact should be permitted to consider National's conduct before INA's tender of the primary policy limits equally with National's post-tender conduct. Although INA was providing Granada's defense, KMC suggests that National's pre-tender conduct was relevant because National also had a duty to contribute to that defense. According to KMC, that duty arose once liability under the excess policy became reasonably clear. KMC cites four cases and two commentaries in support of its position. Both commentators explain, however, that KMC's favored view is not shared by a majority of courts that have considered the issue. *See* Ostrager & Newman, Handbook on Insurance Coverage Disputes, § 6.03[c], at 296 (10th ed.2000); 14 Couch on Insurance 2nd § 51:36, at 446–47 (1982).

The majority rule is that "[w]here the insured maintains both primary and excess policies, ... the excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted." *See Texas Employers Ins. Ass'n v. Underwriting Members of Lloyds*, 836 F.Supp. 398, 404 (S.D.Tex.1993)(quoting 14 Couch on Insurance 2nd § 51:36, at 446 and citing numerous cases); *see also* 14 Russ & Segala, Couch on Insurance 3rd §§ 200:44–200:45 (1999); Ostrager & Newman, *supra* § 6.03[b], at 294. The majority rule is supported by the reasonable expectations of the insured and its insurance carriers. Excess insurers are able to provide relatively inexpensive insurance with high policy limits because they require the insured to contract for underlying primary insurance with another carrier. The primary carrier generally provides a much lower amount of coverage, but must insure against what is likely to be a greater number of claims and must provide a defense. *See Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 279 (5th Cir.

1989); *Hartford Accident & Indem. Co. v. Continental Nat'l Am. Ins. Cos.*, 861 F.2d 1184, 1187 (9 th Cir.1989). The premiums charged are thus a reflection of the risks undertaken. Because the primary insurer's duty to defend extends to covered claims without regard to their amount, an excess insurer's duty to defend is not typically invoked merely because a claim has been asserted against the insured in excess of primary limits. *See* 1 WINDT, INSURANCE CLAIMS & DISPUTES § 4.11 (3 rd ed.1995). Thus, we agree with the court of appeals that National's alleged negligence in failing to participate in or otherwise contribute to Granada's defense before the primary carrier's tender of policy limits is irrelevant to the claims of contributory negligence or comparative fault.

■■■ Although National's duty to defend was not invoked before tender, neither could National affirmatively disrupt or harm the insured's defense. *See Canal*, 843 S.W.2d at 486 (Hecht, J. concurring); *see also Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 434 (Tex.App.—Houston [14th Dist.] 1998, pet. denied)(duty to cooperate is implied in every contract in which cooperation is necessary for performance). Any evidence that National interfered with or controlled the defense before tender may be relevant to the issue of comparative responsibility. *See, e.g., Birmingham Fire Ins. Co. v. American Nat'l Fire Ins. Co.*, 947 S.W.2d 592, 596 (Tex.App.—Texarkana 1997, writ denied)(comparative responsibility issue submitted against excess carrier who negligently disclosed information to plaintiff's counsel in third-party claim against insured). KMC complains that National failed to appear for a deposition during the Wolf Point litigation and was held in contempt by the trial court. It is not clear from the summary judgment record how this conduct harmed the insured's defense; but if KMC can show that

it did, such evidence would be relevant to the issue of National's comparative responsibility.

B. Excess Carrier's Duty to Settle

■■■ KMC also argues that the $7 million settlement was excessive and that National should bear some responsibility because it had the opportunity to settle the case for much less. Specifically, KMC points out that National did not respond to, suggest counter offers to, or even discuss the plaintiff's $3.6 million settlement demand presented weeks before the trial began.

■■■ An insurer's duty to settle is independent of its duty to defend. 14 COUCH ON INSURANCE 3 rd §§ 203:12–203:13; 1 WINDT, *supra* § 5.26, at 350. An excess insurer owes its insured a duty to accept reasonable settlements, but that duty is also not typically invoked until the primary insurer has tendered its policy limits. 1 WINDT, *supra* § 5.26; *Cf. Employers Nat'l Ins. Co. v. General Accident Ins. Co.*, 857 F.Supp. 549, 554–55 (S.D.Tex.1994)(when excess liability is likely, an excess insurer may interject itself into settlement negotiations before tender by the primary insurer). Here the primary insurer did not tender its limits until the trial began, well after the $3.6 million demand had been withdrawn. National did not assume control of the defense before INA tendered its limits and had no duty to evaluate the $3.6 million settlement demand until after that tender. Accordingly, National's failure to respond to the settlement demand is not evidence of its contributory negligence or comparative fault.

C. Excess Carrier's Duty of Ordinary Care

■■■ INA [4] complains that even though National may not have been under a duty

---

4. As the court of appeals explained, the merits of National's negligence claim against INA is not a part of this appeal because the trial court denied INA's motion for summary judg-

ment, leaving the claim for trial. 955 S.W.2d at 125–26. Such claim was therefore not part of the severed cause appealed to that court. The court of appeals, however, considered the

to participate in the defense, investigation or negotiation of the Wolf Point case prior to INA's tender, INA should nevertheless be permitted to use evidence of National's mismanagement of the excess claim to show National's comparative responsibility. INA urges that a reasonably prudent excess carrier would have done more than National did to protect itself from liability under the excess policy. Specifically, INA says that National should have: explored coverage issues more diligently, reserved its rights against the insured, investigated the merits of the third-party claim more thoroughly, hired independent counsel to monitor the third-party claim, supervised its claims adjuster more closely, and demanded to settle the claim months before trial. These actions, INA submits, were necessary under National's duty to protect itself. *See Walgreen–Texas Co. v. Shivers,* 137 Tex. 493, 154 S.W.2d 625, 630 (1941)(contributory negligence is that conduct which creates an unreasonable risk of harm to oneself).

■ The court of appeals, however, concluded that National could not have been negligent in failing to take the actions suggested by INA because it had no duty to act before INA tender its policy limits. We agree. As we have explained, before INA's tender, responsibility for Granada's defense rested with the primary carrier and KMC. During this period, National was not required to supervise the insured's defense and had no duty to anticipate that INA or Granada's attorneys were not performing appropriately, if indeed they were not. *See De Winne v. Allen,* 154 Tex. 316, 277 S.W.2d 95, 98 (1955)(claimant is not contributorily negligent for failing to anticipate the negligence of another). In fact, INA and KMC still deny that the defense was mishandled, contending instead that National was so disorganized that it failed

to reasonably follow the progress of the case. But, as we have explained, National had no duty to act until INA tendered its limits and surrendered the defense to National. *See* 1 WINDT, *supra* § 2.01, at 31. Accordingly, we agree with the court of appeals that National's pre-tender conduct is irrelevant to the issue of comparative responsibility unless there is evidence that National interfered with the insured's defense or assumed control of the defense at some earlier point in time.

### D. Excess Carrier as a Volunteer

■ KMC contends that National is not entitled to equitable subrogation because National voluntarily settled the case against Granada. KMC submits that had National thoroughly investigated the underlying claim it would have discovered that its excess policy did not provide coverage for the Wolf Point claim. If National was indeed under no obligation to indemnify its insured, KMC reasons, subrogation would not be available. We disagree.

■ An insurer who pays a third-party claim against its insured is not a volunteer if the payment is made in good faith and under a reasonable belief that the payment is necessary to its protection. *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. Aries Marine Corp.,* 932 F.2d 442, 447 (5th Cir.1991). In the context of equitable subrogation, "Texas courts have been liberal in their determinations that payments were made involuntarily." *Argonaut Ins. Co. v. Allstate Ins. Co.,* 869 S.W.2d 537, 542 (Tex.App.—Corpus Christi 1993, writ denied). An excess insurer's payment to settle a suit against the insured has been said to be presumptively involuntary for subrogation purposes. *See id.* at 543.

merits of INA's affirmative defense of comparative responsibility to National's negligence claim as being part of the appeal. On that issue it reversed the trial court's summary judgment that had foreclosed this defense. KMC has raised the identical issue in

its appeal, and no other party has objected to including the merits of INA's separate but identical defense in the appeal. Under these rather unusual circumstances, we also consider INA's arguments as part of this appeal.

KMC's position is contrary to our liberal application of the reasonable belief rule. Adopting it would significantly increase potential conflicts of interest between insureds and their insurers. "If an insurance company's right to subrogation could be challenged by the wrongdoer on the grounds that the policy did not actually provide coverage, it would necessarily be in the company's interest to litigate all questionable claims with its insured. The effect of ignoring the reasonable belief rule, therefore, is to discourage insurance companies from paying or settling disputed claims and thereby force insureds more often into litigation with their insurers." 1 WINDT, *supra* § 10.10 at 150–51. KMC's conception of the volunteer doctrine is bad public policy, and we decline to adopt it.

### E. Causation

 INA argues that because National's subrogation rights are based upon equitable principles, fairness requires that all of National's conduct—both pre- and post-tender—be considered in a comparative responsibility issue. The parties' respective liability theories, however, fail to raise any issue about National's pre-tender conduct.

INA asserts that National caused its own harm by deciding to negotiate and settle the Wolf Point litigation without first making a reasonable assessment of coverage, liability facts or potential damages. This lack of preparation, INA reasons, caused National to pay too much. Similarly, KMC asserts that National settled the Wolf Point litigation for too much not because of any fault by KMC, but because National erroneously lacked faith in KMC's work. KMC likewise attributes the excessive settlement to National's own panic following INA's abrupt tender of the primary policy limits. National, on the other hand, agrees that it may have settled the claim for too much, but contends that it was forced to negotiate the $7 million

dollar settlement because INA's inadequate supervision and KMC's inept trial preparation put it and the insured at grave financial risk. Thus, everyone apparently agrees that the settlement was excessive. They only disagree on who was at fault for the excessive amount being paid.

To recoup any of its payment, National must prove that its $7 million settlement was excessive in the abstract, yet reasonable under these circumstances because of the defense provided for Granada. If the value of the case with a competent defense would have equaled or exceeded $7 million, then National suffered no harm regardless of whether INA or KMC mishandled the insured's defense. Even if National can prove that its settlement was excessive, it must also prove that INA or KMC mishandled the defense and that a judgment for Wolf Point in excess of the case's true value [5] would have resulted from KMC's malpractice. National's entitlement to damages will thus depend on proof that the true value of Wolf Point's claim was less than $7 million but that KMC's malpractice inflated its value. Assuming such proof, National may then recover as damages the difference between the true and inflated value less any amount saved by the settlement.

### IV. Conclusion

The release agreement between KMC and the insured, assuming it is valid, does not foreclose legal malpractice claims arising from KMC's actions or omissions after April 1, 1992. The court of appeals therefore correctly reversed the summary judgment for KMC and remanded National's and INA's claims for trial. The court of appeals also correctly reversed the summary judgment for National on KMC's and INA's affirmative defense of comparative responsibility. The court of appeals further properly limited the scope of that defense to National's post-tender conduct, although pre-tender conduct might be ad-

---

**5.** The true value is the recovery Wolf Point would have obtained following a trial in which Granada had a reasonably competent, malpractice-free defense.

missible if the insured's defense were harmed by National's interference. Because there is no error in the judgment of the court of appeals, we affirm.

Justice HECHT filed a concurring opinion, joining Parts I and II of the Court's Opinion and the Court's Judgment.

Justice HECHT, concurring in part and concurring in the judgment.

I agree with the Court's statement of the case and its resolution of the issues relating to the release; hence, I join in Parts I and II of the Court's opinion. I also conclude on the record before us that Insurance Company of North America, the primary insurer against a third-party liability claim, and Keck, Mahin & Cate, the attorneys hired to defend the claim, have not shown that they should be entitled, in defense of this equitable subrogation action brought by the excess carrier, National Union Fire Insurance Company of Pittsburgh, PA, to offer evidence of National's conduct that occurred before INA tendered its policy limits to settle the liability claim against its insured. But I do not agree with the broad basis on which the Court founds this conclusion in Part III of its opinion.

INA provided $1 million in primary liability coverage, and National provided $9 million in excess coverage. As the Court states, "[t]he excess policy did not require National to investigate or defend claims against [the insured] as long as another underlying insurance carrier was providing a defense." [1] But as the Court also notes, "National did have the right [under its policy] to associate in the defense and trial of any claim it deemed a threat to its liability". [2]

National alleges in this equitable subrogation action that it had to pay an excessive amount to settle a liability claim because of INA's and KMC's mishandling of the defense of the claim. INA and KMC argue that National's own conduct contributed to the payment of an excessive settlement. The Court holds that National's conduct prior to INA's tender of policy limits to the third-party liability claimant is irrelevant unless National interfered with or took control of the defense. The Court bases this holding on a general rule that an excess insurer has no duty to defend or settle a liability claim before the primary insurer has tendered the limits of its policy.

The Court purports to follow the "majority rule" that an "'excess liability insurer is not obligated to participate in the defense [of a third-party claim] until the primary policy limits are exhausted.'" [3] The authority cited for this proposition is the 1982 *Couch on Insurance* treatise, which adds, two sentences later: "But certain courts have held that the excess carrier must participate in the defense and share in the cost of defense when it is clear that the potential judgment against the insured may be substantially greater than the amount of the primary policy limits." [4] It is not at all clear from the 1999 supplement to the treatise whether the rule stated in 1982 still holds true. [5] Later treatises, including the third edition of *Couch on Insurance*, which the Court cites as additional source material, reflect some erosion from the so-called "general rule". One of these treatises explains:

Where the insured maintains both primary and excess policies, the general rule is that an excess liability insurer is

---

1. *Ante* at 695.

2. *Ante* at 695.

3. *Ante* at 700 (quoting *Texas Employers Ins. Ass'n v. Underwriting Members of Lloyds*, 836 F.Supp. 398, 404 (S.D.Tex.1993) (quoting 14

GEORGE J. COUCH, COUCH ON INSURANCE 2D § 51.36 (1982))).

4. 14 COUCH ON INSURANCE 2D § 51.36, at 446 (1982).

5. *See* COUCH ON INSURANCE 2D § 51.36 (Supp. 1999) (citing numerous cases).

not obligated to participate in the defense until the primary policy limits are exhausted.

Accordingly, it has been held that an excess insurer has no duty to defend where there was no evidence that the underlying policy limits would be exceeded, where an exclusion in primary insurer's policy relieved the primary insurer of the duty to indemnify the insured, or where there was no allegation that the primary insurer might become insolvent.

An excess insurer may have a duty to defend an insured where the claim against the insured is in excess of the limits of the underlying coverage. Some courts have held that an excess carrier must participate in the defense and share in the cost of defense when it is clear that the potential judgment against the insured may be substantially greater than the amount of the primary policy limits.[6]

The other treatise refers to the Court's rule as "the traditional view" but cites numerous cases for the proposition that "in appropriate circumstances, excess carriers may owe a duty to participate in the insured's defense." [7]

The Court offers one policy justification for the "general rule"—that excess insurance is less expensive because excess insurers' "duty to defend is not typically invoked".[8] In this case, however, National's refusal to involve itself in the defense of the claim resulted in its ultimately paying $7 million to settle a claim that plaintiffs had been willing earlier to settle for $3.6 million. This is some indication, at least, that an excess insurer's complete abstention from the litigation until the primary limits are tendered makes excess insurance more expensive, not less expensive. INA and KMC never believed that the claim could be settled within primary policy limits, and thus INA had little to gain by tendering its limits. Had National intervened to attempt to settle the case, the result would almost certainly have been far less than the $7 million it paid after trial began. These circumstances are hardly unique. Even if National succeeds in its claims against INA and KMC and recoups a part of what it paid, insurance rates will still be affected. The point is, it is not intuitively obvious, as the Court seems to think—and it is certainly not obvious from this case—that the Court's "general rule" keeps down insurance costs.

I am not persuaded that an excess insurer never has a duty to defend or settle a claim against its insured before primary coverage is exhausted. An excess carrier that has the right to intervene in the defense may be obligated to do so to protect itself and its insured when it is clear that the liability claim will exceed primary coverage. Take the following example. *P* sues *D*, whose primary insurer, *PI*, assumes the defense. *P*'s claim is probably worth $5 million, which exceeds *PI*'s $100,000 policy limits and *EI*'s excess policy limits of $1 million. *P* offers to settle for $1.1 million, but *PI* refuses, believing *D* has an absolute defense to *P*'s claim. *EI* does nothing. When *P* obtains a judgment for $5 million, *PI* must pay $100,000, *EI* must pay $1 million, and *D* must pay $3.9 million. *D* has no *Stowers* claim against *PI* because it never received a settlement demand within its policy limits, and, under the Court's absolute rule, *D* has no claim at all against *EI*.[9] This result obtains even though *D* paid premiums for insurance that would have settled his liability. Also, *EI* has no subrogation claim against

---

6. LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D §§ 200.44–.45 (1999) (footnotes omitted).

7. BARRY R. OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 6.03 (9th ed., 1998) (footnotes omitted).

8. *Ante* at 701.

9. *See Westchester Fire Ins. Co. v. American Contractors Ins. Co. Risk Retention Group*, 1 S.W.3d 872 (Tex.App.—Houston [1st Dist.], no pet.).

*PI* because *D* has no claim to which *EI* could be subrogated. Thus, the principal cause of the excess judgment, *PI,* is wholly insulated from responsibility. This is but one instance in which I think an excess insurer's duty to be involved in the defense of a claim must be carefully examined.

A rule absolutely insulating an excess insurer from responsibility for any defense of a claim prior to tender of the primary coverage is even less defensible, it seems to me, in an equitable subrogation action like this one. Suppose in my example that *A,* the attorneys hired to defend the claim, urge *PI* to accept *P*'s offer, but *PI* refuses. So *A* writes *EI* as follows:

> We know that you have no duty to assist in the defense of this case, but you do have the right under your policy to protect your own interests, and you should exercise that right now. *P* has made a settlement offer within primary and excess coverage although liability could be much greater. We are worried that not only could your limits be exhausted but that *D* himself could even be exposed personally. We have handled this case superbly to have obtained as low an offer as *P* has made. Attached is a complete summary of what we have done and what we have decided not to do. If *P* ultimately obtains by judgment or settlement much more than the present offer, as we almost certainly think he will, then it will not surprise us if you try to shift some of the responsibility for your inaction to us, claiming that we did not properly handle the case. If that happens, we want to be able to defend ourselves by showing that you were fully warned, and that any complaints you make against us are pretextual to cover your own ineptness. So if you sue us later, we intend to introduce this letter into evidence so that the jury can see what really happened.

Assuming *EI* has refused to involve itself in *D*'s defense, the Court's rule would bar *A* from offering this evidence that *EI*'s subsequent malpractice claim was a disin-genuous effort to look for someone else to share in the burden of what was paid to *P.* A strong argument can be made, I think, that the excess insurer's hands are not clean for purposes of its equitable claim of subrogation.

But I do not have to decide that issue here. I am not prepared to decide exactly when an excess insurer may be liable for refusing to involve itself in the defense of a claim. The weight of the learned commentary and the differences in the multitude of cases in the area convinces me that the Court should proceed more carefully than it does today. The record before us does not present circumstances that justify admission of the type of evidence KMC and INA wish to offer against National. I do not say that no such evidence exists, only that it is not reflected in our record. On that narrow basis, I agree that the court of appeals reached the correct result.