Affirmed and Opinion filed December 14, 2004









Affirmed and Opinion filed December 14, 2004.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-03-00747-CV

____________

 

NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Appellant

 

V.

 

KECK, MAHIN &
CATE AND ROBERT PLESSALA, Appellees

 



 

On Appeal from the 80th
District Court

Harris County, Texas

Trial Court Cause No. 94-18363

 



 

O P I N I O N

Appellant National Union Fire Insurance
Company of Pittsburgh, PA (“National Union”), an excess insurance carrier, sued
appellees, who represented National Union’s insured, Granada Food Corporation
(“Granada”), in an underlying lawsuit. 
As an equitable subrogee of Granada, National Union alleged that Keck,
Mahin & Cate (“KMC”) and one of its attorneys, Robert Plessala, committed
legal malpractice in their defense of Granada in the underlying lawsuit.  The jury returned a verdict for KMC and
Plessala, and the trial court entered a final take-nothing judgment against
National Union.  We affirm.








Factual and
Procedural Background

This is not the first time this litigation
has been before this Court.  In 1997, we
were faced with, among other things, the issue of whether summary judgment was
proper for KMC.  See Nat’l Union Fire
Ins. Co. of Pittsburgh, Pa. v. Ins. Co. of N. Am., 955 S.W.2d 120 (Tex.
App.—Houston [14th Dist.] 1997), aff’d sub nom. Keck, Mahin & Cate v.
Nat’l Union Fire Ins. Co. of Pittsburgh, Pa., 20 S.W.3d 692 (Tex.
2000).  Our opinion was affirmed by the
Texas Supreme Court, and although we need not discuss all aspects of either
opinion in detail here, we borrow liberally from both opinions to summarize the
underlying lawsuit and National Union’s claims in this subrogation lawsuit.

In September of 1991, Wolf Point Shrimp
and its owner (collectively “Wolf Point”) sued Granada for damages allegedly
caused by Granada’s improper processing and marketing of shrimp grown and
harvested by Wolf Point the previous fall. 
Granada hired KMC as its attorneys in the lawsuit, and KMC tendered the
defense of the lawsuit to Granada’s primary insurance carrier, Insurance
Company of North America (“INA”), and Granada’s excess insurance carrier,
National Union.  INA’s primary policy
provided a limit of $1 million per occurrence. 
National Union’s commercial umbrella policy provided an additional $9
million in excess coverage.

INA agreed to defend Granada under a
reservation of right to contest coverage, and Granada elected to keep KMC as
its counsel.  INA formally engaged KMC to
defend Granada in the Wolf Point litigation, and Plessala was assigned primary
responsibility for the defense.  During
the course of the litigation, Wolf Point demanded $3.6 million to settle the
lawsuit.  INA and National Union were
both informed of the demand, but neither insurer expressed interest in settling
for that amount.  Plessala advised that
the case could probably be settled at that time for less than half this sum.








In January of 1992, the trial court gave
the Wolf Point lawsuit a preferential trial setting for April 28, 1992.  Plessala’s efforts to continue the trial
setting were unsuccessful, and the case proceeded to trial.  On the first day of trial, INA tendered its
policy limits to National Union.  Two
days later, National Union settled the lawsuit for $7 million, and a final
judgment was later signed for that amount.

National Union filed its lawsuit against
INA, KMC, and Plessala to recover some of the money it paid to settle the Wolf
Point lawsuit.  Under the doctrine of
equitable subrogation, National Union asserted claims, including negligence,
against INA and a legal malpractice claim against KMC and Plessala.  INA asserted a cross-claim against KMC and
Plessala for malpractice and asserted the affirmative defenses of contributory
negligence and comparative responsibility against National Union.  KMC and Plessala pleaded the same affirmative
defenses against National Union and further pleaded that a release agreement
between it and Granada barred National Union and INA’s claims against Plessala
and KMC.

All of the parties filed motions for
summary judgment.  The trial court
granted summary judgment for KMC on the two insurers’ subrogation claims for
malpractice because of the KMC‑Granada release agreement.  The trial court also granted partial summary
judgment for National Union, rejecting INA and KMC’s affirmative defenses of
contributory negligence and comparative responsibility.  The trial court granted INA’s motion for
partial summary judgment, thereby eliminating National Union’s claims of gross
negligence and violations of the Texas Insurance Code.  The trial court then severed National Union
and INA’s claims against KMC and rendered a final judgment that the two
insurers take nothing against KMC.  On
appeal, the Supreme Court held that KMC had not met its burden of proving that
the release agreement was a complete defense to National Union and INA’s
equitable subrogation claims.  The court
also determined that KMC and INA could raise National Union’s comparative
responsibility in defense to the respective negligence claims against
them.  The court remanded the case for
trial, and the jury found that the release executed by KMC and Granada was
valid and that the negligence of INA and National Union, rather than the
negligence of Plessala (if any), proximately caused the loss to National Union.[1]








In six issues, National Union argues that
(1) the release is invalid as a matter of law because it covers prospective
claims and Granada did not have independent representation, (2) the evidence is
legally and factually insufficient to support the jury’s finding that the
release is valid, (3) the trial court erred in submitting an improper jury
instruction regarding proximate cause, (4) the evidence is factually
insufficient to support the jury’s finding that 
Plessala was not negligent or did not damage National Union, (5) the
evidence is legally and factually insufficient to support a finding that
National Union was negligent, and (6) the evidence is legally and factually
insufficient to support a finding that INA was negligent and caused National
Union damages.  We conclude the evidence
is factually sufficient to support a finding that Plessala was not
negligent.  We further conclude that the
release is not invalid as a matter of law and that there is sufficient evidence
to support the jury’s finding that the release is valid.  Therefore, we affirm.

                                        Negligence
of Plessala

A claim for attorney malpractice in Texas
is based on negligence.  Cosgrove v.
Grimes, 774 S.W.2d 662, 664 (Tex. 1989). 
The jury must evaluate an attorney’s conduct based on the information
available at the time to determine if a reasonably prudent attorney could make
the same decision in the same or similar circumstances.  Id. at 664–65.








In this case, the jury was asked whether
Plessala’s negligence, if any, proximately caused National Union’s loss, and
the jury answered “no.”  In its fourth
issue, National Union challenges the factual sufficiency of the evidence to
support this answer.  In reviewing
factual sufficiency, we examine the entire record, considering both the
evidence in favor of, and contrary to, the challenged findings.  See Cain v. Bain, 709 S.W.2d 175, 176
(Tex. 1986).  After considering and
weighing all the evidence, we set aside a fact finding only if it is so
contrary to the overwhelming weight of the evidence as to be clearly wrong and
unjust.  See Pool v. Ford Motor Co.,
715 S.W.2d 629, 635 (Tex. 1986).  The
trier of fact is the sole judge of the credibility of the witnesses and the
weight to be given their testimony.  GTE
Mobilnet of S. Tex. Ltd. P’ship v. Pascouet, 61 S.W.3d 599, 615–16 (Tex.
App.—Houston [14th Dist.] 2001, pet. denied). 
We will not substitute our judgment for that of the trial court merely
because we might reach a different conclusion. 
Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998);
Pascouet, 61 S.W.3d at 616.

On appeal, National Union contends that
Plessala was negligent in five ways, specifically, in failing to (1) depose the
individual plaintiff, (2) depose Wolf Point’s experts or otherwise pin down the
bases for their opinions, (3) consult with experts to help present Granada’s
case on liability and damages, (4) hire local counsel, and (5) pay the jury
fee.

National Union presented expert evidence
on the negligence issue from Judge David West, a retired district court judge
with over fifteen years of experience on the bench.  Plessala did not depose Wolf Point’s owner,
who was an individual plaintiff in the underlying suit.  According to Judge West, this was negligent
because the plaintiff needed to be “pinned down” on his allegations, such as
how much shrimp was lost.  Thirty days
before trial, Wolf Point designated an expert on liability regarding Granada’s
fault in ruining the shrimp and an expert on damages.  Plessala neither deposed these witnesses nor
requested that their opinions be reduced to writing.  As a result, Plessala did not know the
experts’ opinions, such as that Wolf Point had lost over $14 million in future
profits.  Plessala also did not
personally consult with any experts to prepare a defense to liability or
damages.  Wolf Point’s suit was filed in
Matagorda County, which Plessala acknowledged is a “plaintiff’s county” based
on its high jury verdicts.  Wolf Point
was represented at trial by two prominent attorneys with connections to the
judge, Neil Caldwell.  Plessala did not
hire local counsel and did not pay the jury fee (which he assumed Wolf Point
had paid), both of which could have helped insulate Granada from potential
bias.  Judge West testified that all of
these failures were unreasonable under the circumstances and therefore fell
below the standard of care.








Plessala responded with his own testimony
as well as testimony from Tom Easley, the Granada representative in charge of
the Wolf Point litigation, and Fred Hagans, a legal malpractice expert who has
been practicing law over thirty years. 
Plessala explained that he and Easley concluded early on that Granada
had no real liability defense.  Wolf
Point had deposed one of Granada’s former employees, who testified to several
facts that would have made challenging liability extremely difficult.  After Plessala shared this testimony with
Easley, Easley contacted the general manager of a shrimp farm in Panama
affiliated with Granada for advice, who also expressed concern over Granada’s
potential liability.  Though National
Union hired an expert in the malpractice trial that said Granada was not
negligent, Plessala thought it unwise to attempt to find a similar outside expert
because he believed that would have challenged the veracity of his own
client.  Therefore, Plessala decided the
best strategy was to essentially concede liability and focus on containing
damages.  Most of the items of damages,
such as the value of the shrimp, were well established, but Plessala was
particularly concerned about limiting Wolf Point’s claim for lost profits,
which Plessala believed to be invalid as a matter of law.  He chose not to depose the individual
plaintiff because Plessala had very detailed information on Wolf Point’s allegations
from discovery responses and from a settlement brochure sent by Wolf Point’s
attorneys.  He also thought deposing the
plaintiff would only make the plaintiff a better witness, and Plessala feared
damages questions would have revealed his case strategy.  Plessala did not depose Wolf Point’s
liability expert because Granada was not contesting liability, and he did not
think it was necessary to depose the damages expert because Plessala believed
he knew what his testimony would be based on the settlement brochure.  Plessala also chose not to hire a damages
expert because his lost profits argument was primarily legal and he thought he
could establish the facts he needed through cross-examination of Wolf Point’s
damages expert and the individual plaintiff. 
Finally, Plessala testified that he did not hire local counsel because
he did not think he needed it and that he was “happy” to try the case to the
judge rather than a jury because he believed that would help contain damages.








Hagans testified that he believed Plessala
not only met but exceeded the standard of care under the circumstances.  He discussed each criticism of Plessala’s
conduct and explained why, in his opinion, each decision was reasonable.  For example, Hagans testified, and Judge West
agreed on cross-examination, that whether to take a plaintiff’s deposition (or
any witness’s deposition) is a case-by-case judgment call.  Here, Plessala had detailed information on
Wolf Point’s allegations from the settlement brochure, which was the most
detailed settlement brochure Hagans had ever seen and, according to Hagans,
provided better information than most written discovery responses or
depositions.  Hagans took offense at
National Union’s implication that it was impossible to get a fair trial in
Matagorda County in front of Judge Caldwell and stated that not hiring local
counsel was a reasonable decision. 
Hagans believed Plessala’s case strategy to focus only on containing
damages was reasonable under the circumstances and that his decisions in
carrying out that strategy, such as not deposing Wolf Point’s experts and not
hiring his own experts, were also reasonable.

Easley testified that he was aware of
Plessala’s overall strategy of not contesting liability and agreed with it.  Based on the information in the depositions
and Easley’s discussion with the general manager of the shrimp farm in Panama,
Easley concluded that Wolf Point’s shrimp were most likely ruined by Granada’s
processing.  Easley was completely
satisfied with Plessala’s representation in the Wolf Point matter, and Granada
refused National Union’s request to join it in a malpractice action against KMC
and Plessala.








National Union argues that the jury’s
finding that the release between Granada and KMC and Plessala is valid
effectively “gutted” its malpractice claim by preventing the jury from
considering all of Plessala’s conduct. 
The release covered all claims attributable to services rendered from
June 1, 1988 through April 1, 1992, and the jury was therefore instructed “not
[to] consider any conduct by [Plessala] that occurred on or before April 1,
1992.”  National Union fails to delineate
which of the five categories of alleged negligence it believes the jury could
and could not have properly considered under this instruction.[2]
Nevertheless, even considering the full range of conduct National Union claims
was negligent, we find the evidence factually sufficient to support a finding
that Plessala was not negligent.  Viewing
the entire record, we do not find the overwhelming weight of the evidence is
against the jury’s finding.  Indeed,
there was plenty of evidence from which the jury could have determined that
Plessala was not negligent.  Therefore, we
overrule National Union’s fourth issue.

Because there is some risk the jury could
have decided not to consider some of Plessala’s conduct in attempting to follow
the trial court’s instructions once it found the release to be valid, we will
address National Union’s first and second issues regarding the validity of the
release.  However, given our conclusion
that sufficient evidence supports a finding that Plessala was not negligent, we
need not address National Union’s remaining issues.[3]

                                        Validity of the Release

KMC and Granada entered into a release on April 10, 1992,
about three weeks before the Wolf Point trial was scheduled to begin.  Granada owed KMC over $880,000 in unpaid
legal fees for matters other than Wolf Point, and in exchange for KMC’s promise
to forgive these unpaid fees, Granada gave KMC an interest in certain other
pending litigation KMC was handling and released KMC from “any and all demands,
claims or causes of action of any kind whatsoever, statutory, at common law or
otherwise, now existing or that might arise hereafter, directly or indirectly
attributable to the rendition [of] professional legal services by KMC to
Granada between June 1, 1988 and April 1, 1992.”  The release also contains a provision stating
that “KMC has advised Granada in writing that independent representation is
appropriate in connection with the execution of this Agreement.”  However, Granada did not seek independent
representation because it thought the release was in its interest and therefore
considered consulting an attorney unnecessary.








In KMC’s original motion for summary
judgment, it argued that since National Union stood in Granada’s shoes as
subrogee, the release between KMC and Granada barred National Union’s
claims.  National Union argued that the
agreement was invalid because Granada did not understand the agreement and was
not fully informed prior to signing the release.  When the supreme court reviewed this matter,
it explained that contracts negotiated during the existence of an attorney-client
relationship are closely scrutinized and, because of the fiduciary nature of
the relationship, there is a presumption of invalidity or unfairness attaching
to such contracts.  Keck, 20
S.W.3d at 699.  To rebut this
presumption, KMC must prove that (1) the release was “fair and reasonable” and
(2) “Granada was informed of all material facts relating to the release.”  Id. 
The record established only that Granada was advised in writing to seek
independent counsel, but this “bare recitation” was inadequate to carry KMC’s
summary judgment burden, therefore necessitating a trial.  Id. 


In its first issue, National Union contends the release is
invalid as a matter of law because it covers prospective claims[4]
and Granada did not have independent legal representation, in violation of Rule
1.08(g) of the Texas Disciplinary Rules of Professional Conduct.  In its second issue, National Union asserts
that the evidence is legally and factually insufficient to support the jury’s
finding that the release is valid.

                               Is the release
invalid as a matter of law?

Rule 1.08(g) of the Disciplinary Rules provides:








A lawyer shall not make an agreement prospectively
limiting the lawyer’s liability to a client for malpractice unless permitted by
law and the client is independently represented in making the agreement, or
settle a claim for such liability with an unrepresented client or former client
with out first advising the person in writing that independent representation
is appropriate in connection therewith.

 

Tex. Disciplinary R. Prof’l Conduct 1.08(g), reprinted in Tex. Gov’t Code Ann., tit. 2, subtit. G
app. A (Vernon 1998).  National Union
contends the release is invalid as a matter of law because KMC violated Rule
1.08(g) by entering into a release with its client that covered prospective
claims when the client did not first secure independent representation.  KMC argues that the release covers only past
conduct and therefore that legal representation was not necessary.  We agree that the release is prospective, but
we conclude that it is not invalid as a matter of law.

The question we must first resolve is whether a release of
future claims based on past conduct is prospective.  National Union contends the release is
prospective because it forgives claims that had not yet accrued.  KMC responds that the release is not
prospective because it disposes only of past conduct not future conduct.  While it is true the release covers past
conduct, the disciplinary rule does not speak in terms of conduct.  Rather, it speaks in terms of liability.  We find the release between KMC and Granada
is an agreement to prospectively limit KMC’s malpractice liability because it
seeks to limit liability that had not yet accrued.  See Am. Elec. Power Co. v. Pub. Util.
Comm’n of Tex., 123 S.W.3d 33, 38 (Tex. App.—Austin 2003, no pet.) (noting
that the part of a utility’s account attributable to fuel‑cost under‑recoveries
“represents merely the recording of a prospective liability” that will not
actually arise until the customers pay their bills).








Notably, a legal-malpractice claim does not accrue until
“facts have come into existence that authorize a [client] to seek a judicial
remedy.”  Apex Towing Co. v. Tolin,
41 S.W.3d 118, 120 (Tex. 2001).  This
means a legal‑malpractice claim does not arise “until the client
discovers or should have discovered through the exercise of reasonable care and
diligence the facts establishing the elements of a cause of action.”  Id. at 121.  Because damages are an element of the legal‑malpractice
claim, the claim does not accrue until the client discovers—or should have
discovered—it was legally injured.  Vacek
Group, Inc. v. Clark, 95 S.W.3d 439, 443 n.2 (Tex. App.—Houston [1st Dist.]
2002, no pet.).  In fact, a cause of
action may not accrue until well after facts alluding to the malpractice have
surfaced.  See Tate v. Goins,
Underkofler, Crawford & Langdon, 24 S.W.3d 627, 636 (Tex. App.—Dallas
2000, pet. denied) (finding cause of action did not accrue when client learned
of potential claim during deposition but only after default judgment was
entered against the client); Estate of Arlitt v. Paterson, 995 S.W.2d
713, 720 (Tex. App.—San Antonio 1999, pet. denied) (dismissing claim made by
deceased appellant’s estate for estate planning malpractice because no claim
for legal malpractice could have accrued prior to appellant’s death).

Here, the release is broad and covers “all demands, claims or
causes of action of any kind whatsoever . . . now existing or that might arise
hereafter.”  The release disposes of all
claims against KMC for malpractice attributable to legal services rendered from
June 1, 1988 to April 1, 1992 in return for Granada’s release of “all present
and future claims” attributable to KMC’s work during that same
period.  Keck, 20 S.W.3d at 698
(emphasis added).  Crucially, any claims
relating to the Wolf Point litigation had not accrued by the time the parties
signed the release agreement because Granada had not yet suffered any injury
from the alleged malpractice.  No actual
injury was manifested until, during settlement negotiations, it became apparent
that actions or omissions of KMC may have significantly increased the
settlement value of the case.  We find
this release, although it concerns past conduct, was an attempt by KMC to
dispose of malpractice liability from causes of action that had not yet
accrued.  By doing so, KMC prospectively
limited its potential liability, and since Granada did not have independent
representation, KMC violated Rule 1.08(g).








However, a violation of Rule 1.08(g) does not automatically
render the release invalid.  The supreme
court determined that the presumption of unfairness attached to the release in
this case because it was negotiated during the attorney-client
relationship.  Keck, 20 S.W.3d at
699 n.3.  “Conversely, had Granada
severed the attorney-client relationship with KMC and hired new attorneys before
agreeing to the release, the presumption would not have arisen.”  Id. 
Thus, the supreme court determined that the consequence of violating
Rule 1.08(g) was not to invalidate the release a matter of law but to require
KMC to overcome the presumption by proving the release is fair and reasonable
and that it informed Granada of all material facts.  See id.  Because violating Rule 1.08(g) does not
invalidate the release as a matter of law, we overrule National Union’s first
issue.

        Is the evidence sufficient to support
a finding that the release is valid?

In accordance with the supreme court’s
opinion, the trial court instructed the jury that to find the release valid,
“(1) the release agreement must have been fair and reasonable; and (2)
[Granada] must have been informed of all material facts relating to the release
agreement.”  The jury determined the
release is valid.  In its second issue,
National Union challenges both the legal and factual sufficiency of the
evidence to support the jury’s finding.

A legal sufficiency review differs from
the factual sufficiency review we outlined above in that in considering legal sufficiency, we
view the evidence in a light that tends to support the disputed findings and
disregard all evidence and inferences to the contrary.  See Lee Lewis Constr., Inc. v. Harrison,
70 S.W.3d 778, 782 (Tex. 2001).  If more
than a scintilla of evidence exists, it is legally sufficient.  Id. 
More than a scintilla of evidence exists if the evidence furnishes some
reasonable basis for differing conclusions by reasonable minds about a vital
fact’s existence.  Id. at
782–83.  








National Union first argues that the
evidence is insufficient to establish that the release was fair and reasonable
because the agreement was not supported by adequate consideration.  Adequacy of consideration is one factor in
assessing the fairness of a transaction involving a fiduciary.  See Estate of Townes v. Townes, 867
S.W.2d 414, 417 (Tex. App.—Houston [14th Dist.] 1993, writ denied).  National Union claims that since Granada
could not pay its legal bills, what KMC gave up in the agreement—the right to
seek payment on uncollectible bills—was of no value.  However, the evidence did not conclusively
establish that Granada would never be able to pay even a portion of its legal
bills.  Granada was experiencing severe
financial difficulties and was attempting to resolve outstanding liabilities
from many creditors to avoid bankruptcy. 
Nevertheless, KMC had the right to attempt to collect what it was owed,
even through the bankruptcy process if necessary.  Granada approached KMC about a plan to
forgive its existing debt while maintaining their attorney-client relationship
in exchange for giving KMC an interest in other litigation KMC was
handling.  KMC agreed, so long as Granada
agreed to a release of legal-malpractice claims.  KMC advised Granada several times, both
orally and in writing, to seek independent representation, but Granada
refused.  Tom Easley, Granada’s
representative in charge of the Wolf Point litigation, testified that Granada
did not believe it needed legal advice because 
the agreement was “very favorable” and “absolutely in [Granada’s] best
interest” by providing substantial debt forgiveness and allowing Granada to
continue to receive KMC’s services on Wolf Point and other matters.  Easley was not concerned about releasing any
malpractice claims because Granada had always been satisfied with KMC’s
representation, and Granada did not believe it had any malpractice claims
against KMC.[5]  The jury was entitled to conclude that
forgiveness of over $880,000 in debt, which eliminated a significant liability
from Granada’s books, and the ability to retain KMC’s legal services, showed
that the transaction was fair and reasonable to Granada.








National Union also contends the evidence
is insufficient to show that KMC informed Granada of all material facts
relating to the release.  National Union
primarily points to the same litany of conduct it claims constituted negligence
by Plessala, such as failing to depose the individual plaintiff or hire
experts.[6]  Based on the evidence in the record discussed
above, the jury could have determined that those items were not material for
the same reasons it could have determined they did not constitute
negligence.  Further, National Union
ignores all the evidence in the record of what Granada did know,
including the unfavorable deposition testimony of its former employee, the
unfavorable opinion of the internal expert Easley consulted, Plessala’s
strategy to focus on damages rather than liability, and Plessala’s decision not
to consult outside experts.

Based on our review of the evidence in the
entire record and of only the evidence supporting the jury’s finding, we
conclude the evidence is legally and factually sufficient upon which to base a
finding that the release is valid. 
Therefore, we overrule National Union’s second issue.

We affirm the trial court’s judgment.

 

 

 

 

 

/s/      Leslie Brock Yates

Justice

 

 

 

 

Judgment
rendered and Opinion filed December 14, 2004.

Panel
consists of Justices Yates, Anderson, and Hudson.











[1]  National Union
and INA settled their claims before trial, and INA is not a party to this
appeal.





[2]  National Union presented testimony
from Judge West that each of Plessala’s failures occurred both before and after
April 1, 1992.  For example, Judge West
testified that  Plessala could have
deposed the plaintiff after April 1 and even up until a week before trial,
which started on April 28, 1992.  





[3]  In its third issue, National Union
asserts error in the trial court’s jury instruction on proximate cause.  Because we have concluded that the evidence
is sufficient to support a finding that Plessala was not negligent, an error in
the proximate cause instruction, if any, was harmless.  We also need not address National Union’s
fifth and sixth issues challenging the jury’s findings that INA and National
Union were negligent because the carriers’ comparative or contributory
negligence is irrelevant in light of our determination that sufficient evidence
supports a finding that Plessala was not negligent.





[4]  KMC contends
National Union waived this issue by not seeking or securing a ruling from the
trial court that the release is prospective. 
However, National Union attacked the jury’s finding in its motion for
new trial, arguing that the release is prospective and that, because
independent counsel did not represent Granada when it entered into the
agreement, the evidence was legally and factually insufficient to support the
jury’s verdict.  Thus, National Union did
not waive this argument on appeal.  See
Rocky Mountain Helicopters, Inc. v. Lubbock County Hosp. Dist., 987 S.W.2d
50, 52 (Tex. 1998) (“The court of appeals erred in holding that the no‑evidence
point in [appellant’s] motion to disregard jury findings did not preserve the
contention that no implied warranty arose under the circumstances of this
case.  [Appellant’s] complaint on appeal
is that no evidence supports the finding that it violated the DTPA.  That complaint encompasses the contention
that no implied warranty arose under the present facts because, if no implied
warranty arose, then evidence that [appellant] failed to perform in a good and
workmanlike manner is no evidence that [appellant] committed a deceptive trade
practice.”).





[5]  National Union
asserts that whether a transaction is fair and reasonable is an objective test,
and since Granada’s opinions are subjective, they are irrelevant.  We disagree. 
Assuming National Union is correct that the test is objective, Easley’s
testimony about how Granada valued and benefitted from the transaction is some
evidence the jury could have considered in determining whether the release was
fair and reasonable.





[6]  National Union
also asserts that KMC failed to disclose all material facts about legal matters
other than the Wolf Point lawsuit that are covered by the release.  However, nothing in the record suggests that
there was anything KMC should have disclosed.  Rather, the undisputed evidence shows that
Granada was satisfied with KMC’s representation on all matters and never
believed it had any malpractice claims against KMC.