**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**February 25, 2004**

**Charles R. Fulbruge III**
**Clerk**

**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 02-41373**

_____

**WALSH HEALTHCARE SOLUTIONS INC.,**

**Plaintiff-Counter Defendant-Appellee/Cross-Appellant,**

**versus**

**AMERISOURCE CORPORATION,**

**Defendant-Counter Claimant-Appellant/Cross-Appellee.**

---

**Appeals from the United States District Court**
**for the Eastern District of Texas**
**No. 5:00-CV-135**

---

Before JONES, MAGILL[*] and SMITH, Circuit Judges.

PER CURIAM:[**]

Walsh Healthcare Solutions, Inc. ("Walsh") sued AmeriSource Corporation ("AmeriSource") seeking lost profits under Department of Veteran Affairs ("VA") pharmaceutical prime vendor ("PPV") contracts . Both Walsh and AmeriSource appeal the district court's order granting and denying various portions of each party's motion for summary judgment. Because the express terms of a

---

[*] Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

settlement agreement entered into by the parties bars each claim raised by Walsh and AmeriSource, we reverse and remand.

**BACKGROUND**

In 1993, Walsh and AmeriSource separately entered into PPV contracts with the VA. AmeriSource's PPV contract covered several geographic regions, while Walsh's PPV contract covered only the South Central region.[1] The contracts both lasted for one year, with four optional one-year extensions. Because the VA invoked all the extensions, the contracts were set to expire in September 1998.

Approximately one year after the parties entered into their PPV contracts, the VA introduced a new mail-order prescription refill system. Rather than having out-patient pharmacies fill these prescriptions, the VA formed a network of government-run Consolidated Mail Outpatient Pharmacies ("CMOPs") to handle all mail-order prescription refills. The medical facilities in the South Central region, which belonged to Walsh under its PPV contract, were assigned to CMOPs in AmeriSource's territory. As a result, AmeriSource became the sole CMOP supplier in the South Central region and Walsh lost a significant portion of the business for which it had contracted.

In December 1995, Walsh and AmeriSource signed a letter agreement ("December Agreement"), which provided that Walsh would supply certain "mainstream" pharmaceuticals to one particular CMOP

---

[1]    Walsh received the PPV contract as part of a small-business set-aside program.

on a regular basis and act as a back-up supplied to other CMOPs. The parties hoped that the arrangement would allow Walsh to recover its lost sales volume. By November 1996, however, Walsh claimed an $8.5 million deficit. As a result, AmeriSource agreed to compensate Walsh for its lost profits, which would be calculated based on an agreed-upon formula. Walsh began submitting invoices to AmeriSource on a regular basis, and AmeriSource paid each invoice in full, though the payments were sometimes delayed.

As the PPV contract term neared its end, the VA realized it was not prepared to enter into new PPV contracts and signed one-page interim contracts ("First Interim Contract") with both Walsh and AmeriSource. The First Interim Contracts were set to expire in March 1999. During the First Interim Contract term, Walsh continued to submit invoices to AmeriSource. In fact, AmeriSource paid Walsh $394,161 for the period of October to December 1998. Walsh later sought compensation in the amount of $404,481 for the period of January to March 1999, which AmeriSource never paid.

Meanwhile, on December 28, 1998, the VA awarded a new PPV contract to AmeriSource that covered the entire country. Walsh filed a bid protest with the General Accounting Office ("GAO") on January 19, 1999, and argued that the VA had failed to adhere to the proper procedures when awarding the new PPV contract. As a result of the bid protest, the VA entered into a second set of interim contracts ("Second Interim Contracts") with Walsh and

3

AmeriSource that would last until June 30, 1999. The GAO ultimately denied Walsh's bid protest on April 28, 1999.

In May 1999, Walsh filed suit against the VA in federal district court. AmeriSource intervened in the suit as a defendant to protect the contract award. In July 1999, Walsh, AmeriSource, and the VA entered into a settlement agreement that accomplished the following: (1) Walsh's Second Interim Contract with the VA would be extended an additional 92 days and would end in September 1999; (2) AmeriSource's new PPV contract would become effective on October 1, 1999; and (3) the parties entered into a release of claims.

In April 2000, Walsh sued AmeriSource in Texas state court, claiming that AmeriSource failed to compensate it for lost profits through March 1999, relying on theories of express and implied contract, third-party beneficiary status, and promissory estoppel. AmeriSource removed the case to federal district court and filed conversion and unjust enrichment counterclaims for $394,161, which AmeriSource alleged it mistakenly paid to Walsh for lost profits from October to December 1998. Walsh then amended its complaint to add a claim for lost profits through September 1999, when the Second Interim Contract expired.

On cross motions for summary judgment, the district court held that (1) the settlement agreement did not preclude the parties' claims; (2) the December Agreement between Walsh and AmeriSource expired in September 1998; and (3) the parties' actions

4

gave rise to an implied contract throughout the duration of the First Interim Contract. The district court denied Walsh's motion for summary judgment on express contract grounds, but granted Walsh's motion on implied contract grounds only for the period of October 1998 to March 1999.[2] Thus, AmeriSource owed Walsh its lost profits of $404,481 for the second half of the First Interim Contract term, or January to March 1999, plus attorneys' fees. Consequently, AmeriSource's cross-motion for summary judgment for conversion and unjust enrichment was denied. Finally, the district court denied Walsh's motion for summary judgment on promissory estoppel. Both parties appealed.

### DISCUSSION

We review de novo a district court's decision to grant or deny summary judgment. Patterson v. Mobil Oil Corp., 335 F.3d 476, 487 (5th Cir. 2003). "Under Texas law, summary judgment may be granted if the terms of a contract are not ambiguous, such that they 'can be given a certain or definite legal meaning or interpretation.'" Petula Assocs., Ltd. v. Dolco Packaging Corp., 240 F.3d 499, 502 (5th Cir. 2001) (quoting Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983)). A district court's interpretation of an unambiguous contract is a question of law subject to de novo review. Guidry v. Halliburton Geophysical Servs., Inc., 976 F.2d 938, 940 (5th Cir. 1992). Because a settlement agreement is a

---

[2] The district court denied Walsh's motion for summary judgment for the period of the Second Interim Contract and its extension to September 1999.

contract, its interpretation is also subject to de novo review. <u>Id</u>.

AmeriSource argues that the plain language of the settlement agreement prevents the parties from asserting the claims in this suit.[3] Conversely, Walsh argues that the settlement agreement was never intended to preclude claims pertaining to the First Interim Contract. The settlement agreement, signed by Walsh and AmeriSource as well as the government, provides that

> Any and all damages, expenses, costs and/or attorney fees of any kind arising from or associated with the bidding on the solicitation at issue, the award, the protest, the proceedings before the VA, the proceedings before the GAO, <u>the extensions of Walsh's contract</u>, the delay in implementation of the AmeriSource contract, and this court action, shall be borne by the party incurring the same . . . . This release specifically includes, but is not limited to, any claims for lost profits, bid preparation costs, attorneys fees and expenses relating to any administrative or judicial proceedings . . . .

(emphasis added). Finally, the settlement agreement contains a release, which states that

> Each party hereby releases and forever discharges each and every other party from any claims, demands, or causes of action which were asserted or which could have been asserted in this suit and/or the underlying administrative proceedings, it being the intention of the parties that any and all issues concerning the bidding, solicitation and the awarding of the contract at issue . . . be and hereby are put to rest.

The district court interpreted Texas law to require the settlement agreement to "mention" the claim being released. The

---

[3] AmeriSource candidly states that, should this court accept its argument, its claims for conversion and unjust enrichment would also be precluded by the settlement agreement.

6

court accordingly held that the settlement agreement pertained only to the "extension of the VA's PPV contract with Walsh." The court's statement alone mischaracterizes Texas release law. As we have previously noted, "[w]e are satisfied that 'mentioning' does not require particularized enumeration or detailed description, only that the claim being released come within the express contemplation of the release provision when viewed in context of the contract in which the release provision is contained . . . ." Stinnett v. Colo. Interstate Gas Co., 227 F.3d 247, 255 (5th Cir. 2000) (citing Mem'l Med. Ctr. of E. Tex. v. Keszler, 943 S.W.2d 433, 435 (Tex. 1997); Victoria Bank & Trust Co. v. Brady, 811 S.W.2d 931, 938-39 (Tex. 1991); Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, 20 S.W.3d 692, 698 (Tex. 2000)).

In this case, several factors indicate that the settlement agreement and release cover the period beginning in October 1998 with the First Interim Contract and continuing through the end of the Second Interim Contract in September 1999. First, the settlement agreement specifically mentions the "extensions" of Walsh's contract. Walsh argues that "extensions" merely refers to the settlement agreement's 92-day extension of the Second Interim Contract. However, this argument is belied by Walsh's express contract theory. Walsh argues separately to this court that the December Agreement between AmeriSource and Walsh was expressly incorporated into both the First and Second Interim Contract, and therefore, that AmeriSource should be forced to compensate Walsh

7

for its lost profits through September 1999. This argument implicitly assumes that the First and Second Interim Contracts are seamless extensions of Walsh's PPV contract. We are persuaded that the term "extensions" in the settlement agreement refers to each extension of Walsh's contract, including the First Interim Contract.

Second, the settlement agreement releases "causes of action which were asserted or which could have been asserted in this suit." When AmeriSource intervened in the suit between Walsh and the VA, both parties had an opportunity to assert the causes of action now raised in this suit. Walsh sent AmeriSource an invoice for the January to March 1999 period in June 1999, one month after initiating its suit and one month before signing the settlement agreement. Thus, Walsh could have asserted its claim for those lost profits against AmeriSource. In addition, summary judgment evidence illustrates that executives at AmeriSource became aware of their allegedly mistaken payment to Walsh in January 1999. Thus, this claim also existed and could have been asserted.

## CONCLUSION

Because the settlement agreement entered into by Walsh and AmeriSource covers the period of time beginning with the First Interim Contract in October 1998 and extending through September 1999, the parties' claims in this case are barred. Consequently, we **REVERSE** the district court's denial of AmeriSource's summary

8

judgment motion with respect to the settlement agreement, **REVERSE** the district court's award of lost profit to Walsh for the period of January to March 1999, **REVERSE** the award of attorney's fees to Walsh, and **REMAND** the case for entry of take-nothing judgment for both parties.

**REVERSED** and **REMANDED**.