Affirmed and Opinion filed June 14, 2011.

 

In The

 

Fourteenth Court of
Appeals

 



NO. 14-09-00815-CV



 

Ronald J. Kormanik and
Michael D. Sydow, Appellants

V.

Victor Seghers, Appellee

 



On Appeal from the 190th
District Court

Harris County, Texas

Trial Court Cause No. 2007-18371



 

OPINION

 

Two lawyers sued an African art aficionado claiming
he breached a contract to pay them a flat fee for implementing a marketing plan
for an extensive Tikar art collection.  The jury found that an attorney-client relationship
existed between one of the lawyers and the art aficionado at the time of the
contract and that this lawyer did not comply with his fiduciary duty.  The jury
did not find any damages to the other lawyer resulting from this breach.  On
appeal, the lawyers challenge the sufficiency of the evidence as to these jury
findings.  We affirm.

I.  Factual And Procedural
Background

Appellee/defendant Victor Seghers, a Belgian
cardiologist, is an aficionado of the  art and culture of the Tikar people of
Cameroon.  Seghers, who had accumulated a substantial collection of Tikar art,
made arrangements with a contact in Cameroon, Emmanuel Mbiam, for shipment of a
portion of the collection to Texas, where Seghers lives.  Seghers encountered
difficulties and significant expense in the process.  When he was unable to
gain possession of the art, Seghers sought assistance from appellant/plaintiff
Ronald J. Kormanik, a Texas lawyer.  Seghers met and consulted with Kormanik in
Texas and explained the problems he had encountered. 

In July 2005, Seghers and Kormanik entered into an
agreement entitled “Contract of Employment and Power of Attorney.”  Seghers
agreed to pay Kormanik a retainer of $25,000.  Kormanik agreed to discounted hourly
billing rates, and Seghers agreed to pay Kormanik, as additional fees, “2 ½% of
the proceeds of the sale, rent, lease or other disposition of the Tikar artwork
now owned, or to be acquired by or through [Seghers].”  Seghers paid Kormanik
the $25,000 retainer, which the parties later orally agreed would simply be a
flat fee.

The
Mbiam Lawsuit

In September 2005, Kormanik filed suit against Mbiam,
a foreign national, and other defendants in a state district court in Bell
County, Texas.  The defendants in the Mbiam suit removed the case to federal
court and moved to dismiss for lack of personal jurisdiction.  Before the federal
court ruled on the jurisdictional issue, the parties reached a settlement in
which Mbiam agreed to return the art in exchange for a full and final release
of any and all claims by Seghers related to the Tikar art.  The settlement
agreement, which was fully executed on April 17, 2006, was followed by a final
judgment dismissing Seghers’s claims with prejudice.

Cameroon
Trip

Before the settlement in the Mbiam lawsuit was
finalized, Seghers asked Kormanik and others to accompany him to Cameroon to
get physical control of the Tikar art collection.  Kormanik proposed a flat fee
of $25,000, plus expenses estimated to be an additional $25,000.  Seghers
ultimately agreed to pay Kormanik $50,000, out of which came Kormanik’s fee and
expenses.  They made the trip and were successful in obtaining physical possession
of the art.

Conflicting
Testimony as to what Happened after the Cameroon Trip

Witnesses presented conflicting testimony at trial as
to what transpired after the Cameroon trip.  Kormanik testified as follows:

·       
Kormanik believed that his attorney-client relationship with Seghers
ended “somewhere in the latter part of June of 2006.” Kormanik did not send
Seghers a letter terminating Kormanik’s representation of Seghers.

·       
After their trip to Cameroon, Kormanik was willing to participate
in helping make the Tikar art project successful.

·       
Kormanik had some discussions with Seghers about the need to
market the Tikar art collection. Kormanik then had discussions with Seghers
about appellant Michael D. Sydow.

·       
At least one month before July 8, 2006, Seghers and his wife met
with Kormanik in Houston to discuss Seghers’s desire to take further action
against Mbiam.  Kormanik explained the releases that Seghers had signed when
the Mbiam lawsuit settled.  Kormanik told Seghers that this “was likely a dead
end,” and Seghers did not pursue further action against Mbiam.

·       
Kormanik asked Seghers to send him $20,000.  Seghers was not
Kormanik’s client when Kormanik received the June 30, 2006 check for $20,000. 
This $20,000 was not sent specifically for legal work, and Kormanik and Seghers
“had not come to any agreement about what, if anything, [they] were going to
do.”  Kormanik asked Seghers to send Kormanik $20,000 because Seghers knew
Kormanik did not work for free and Kormanik was going to set aside his time to
visit with him about the marketing plan. 

·       
Seghers, Sydow, and Kormanik met in Houston on July 8, 2006, in
Kormanik’s office.  This was the first time Seghers had met Sydow, and Kormanik
introduced Sydow by name to Seghers.  Seghers educated Sydow about the Tikar
art.  Before July 8, 2006, Kormanik received a check from Seghers for $20,000.
On this date, Kormanik already had $20,000 of Seghers’s money. 

·       
The next day, at Seghers’s suggestion, the trio went to Temple,
Texas to look at the Tikar art there.  After looking at the art, the trio went
to Seghers’s house in Temple.  Seghers continued to educate Kormanik and Sydow
about the Tikar art, and Seghers gave them about six books so that they could
study the books in preparation to move the project forward.

·       
Sydow had an idea that it would be better if they could interest
celebrities in the Tikar culture and try to convince them of Seghers’s idea
that this art “is going to change essentially the world.”  Sydow thought that
the value of the Tikar art could be increased if celebrities brought the
importance of this art to the public.

·       
On July 10, 2006, Seghers, Kormanik, and Sydow met again for
hours in Kormanik’s Houston office.  They discussed a marketing plan with four
phases.  

·       
In Phase I the goal was to generate interest in Tikar culture
among selected celebrities. They discussed the process by which they would be
identifying, contacting, and educating “lead celebrities,” including the
renowned artist Michael Jackson, and the Jackson family.  Sydow had represented
Michael Jackson in various business dealings. 

·       
In Phase II, there would be publicity regarding the Tikar art,
and they would seek celebrity endorsements and television and movie specials
about the Tikar art.  

·       
Phase III would be the negotiation of the acquisition of the
art.  Seghers was convinced that the value of the whole project to him after
everyone else was paid would be at least $30 million.

·       
Phase IV would involve the exhibition of the Tikar art in museums
and traveling exhibits.

·       
By the end of the meeting on July 10, 2006, Seghers, Kormanik,
and Sydow came to a meeting of the minds that (1) Kormanik and Sydow would go
forward with the marketing plan for the Tikar art; (2) Seghers would pay
Kormanik and Sydow $350,000; and (3) Kormanik and Sydow would pay their own
expenses, except that Seghers would pay their expenses relating to African
academicians.  The three men outlined the marketing plan on a white board.[1] 
They agreed that the $20,000 that Seghers already had paid Kormanik would count
as the July 2006 payment, that Seghers would pay $110,000 right away, and then
pay $20,000 each month until he had paid a total of $350,000. 

·       
Seghers was excited and could not wait to get started.  Seghers
wrote a check for $110,000 to Kormanik and gave it to him on July 10, 2006. 
Kormanik asked Seghers to include Sydow as a payee, but Seghers did not do so. 
Kormanik does not remember seeing the words “attorney fees” on the memo line of
the check.  Kormanik was not going to do any legal work on this marketing
project, nor was Sydow.  Kormanik and Sydow were only to market art.  

Sydow stated he had no knowledge of Kormanik’s prior
dealings with Seghers.  Sydow testified that there was a meeting of the minds
on July 10, 2006, regarding the marketing plan[2]
and that Seghers would pay a flat fee of $350,000, to be divided evenly between
Kormanik and Sydow.  Sydow testified that Seghers paid $110,000 on July 10,
2006, but Sydow did not recall being aware of the $20,000 payment in July
2006.  According to Sydow’s testimony, on July 10, 2006, Sydow believed that
Seghers had paid $110,000 and would pay the remaining $240,000 by monthly
installments of $20,000.  Sydow testified that Kormanik and Sydow would pay
their own expenses, except that Seghers would pay their expenses relating to
African academicians.  Sydow testified that this agreement did not involve any
legal work at all and that Seghers expressly acknowledged that neither Kormanik
nor Sydow would be performing any legal work.

            Seghers testified,
among other things, as follows:

·       
Seghers gave Kormanik the June 30, 2006 check for $20,000 to
investigate and pursue action against Mbiam by Tikar, Inc. (hereinafter, “Tikar
Foundation”), a nonprofit foundation established by Seghers, or to explore
different options.  

·       
The point of this action was to try to see if the $2.8 million
that Mbiam had received from Seghers could be used to improve the local
infrastructure in Cameroon rather than for Mbiam’s personal benefit.

·       
Seghers stated that Kormanik was Seghers’s attorney during the
meeting on July 10, 2006, between Seghers, Kormanik, and Sydow.  

·       
Though Seghers agreed that the three men discussed the plan
outlined on the white board in Kormanik’s office, Seghers denied that he
entered into any agreement of any kind with Kormanik and Sydow on July 10,
2006. Seghers denied that he had made any deal with Kormanik or Sydow to market
the Tikar art collection.  

·       
Seghers gave Kormanik a check for $110,000 on July 10, 2006, and
Seghers wrote “attorney fees” on the memo line of the check at that time.  

Sydow testified that, during the three days after
July 10, 2006, Sydow began reading materials that Seghers had provided, conducted
independent research, and had several hours of conversations with Randy
Jackson, Michael Jackson, and some of Michael Jackson’s advisors about Tikar
culture, Seghers’s theories, and the significance of these theories.  

            Kormanik testified that during the evening of July
13, 2006, Seghers talked to Kormanik on the phone and told him that they had
made a major error in judgment, Seghers did not “want to do this,” and that
Seghers wanted the $130,000 returned.  Seghers sent an email to Kormanik the
next day, saying essentially the same thing.  Kormanik told Seghers that Sydow
and Kormanik had made contacts and that they were getting ready to go to
California and initiate Phase I of the marketing plan.  Kormanik stated that he
wanted to go forward.

Suit by Kormanik
and Sydow against Seghers

            Shortly
thereafter litigation ensued.  After various procedural developments that are
not relevant to this appeal, the parties found themselves in the trial court
below, with Kormanik and Sydow as plaintiffs/counterdefendants, asserting
breach-of-contract claims against defendant/counterplaintiff Seghers.  Seghers
asserted various defenses, and in his counterclaim, he asserted a
breach-of-fiduciary duty claim against Kormanik.  Seghers alleged that Sydow
engaged in a conspiracy to breach Kormanik’s fiduciary duty.  The case was
tried to a jury, which found in pertinent part as follows:

·       
Seghers, Kormanik, and Sydow agreed that Seghers would pay a fee
of $350,000 in exchange for the implementation of a marketing plan.

·       
An attorney-client relationship existed between Kormanik and
Seghers at the time of the agreement which extended to the negotiations and
implementation of the agreement.  

·       
Kormanik did not show that he complied with his fiduciary duty to
Seghers.

·       
Zero dollars, if paid now in cash, would fairly and reasonably
compensate Sydow for his damages, if any, that resulted from the failure to
comply with the agreement.

·       
The sum of $130,000, if paid now in cash, would fairly and
reasonably compensate Seghers for his damages, if any, that were proximately
caused by Kormanik’s breach of fiduciary duty.

The trial court denied the motion for judgment
notwithstanding the verdict filed by Kormanik and Sydow.  The trial court rendered
a final judgment that Kormanik and Sydow take nothing and that Seghers recover
$130,000 plus prejudgment interest against Kormanik.  Kormanik and Sydow filed
a motion for new trial, which the trial court denied.

II. Issues
Presented

            On appeal
Kormanik and Sydow present three issues.  In the first, they assert that the
evidence is legally and factually insufficient to support the jury’s finding
that an attorney-client relationship existed between Kormanik and Seghers at
the time of the marketing agreement.  In their second issue, they assert that
the evidence is legally and factually insufficient to support the jury’s finding
regarding breach of fiduciary duty.   Under their third issue, Kormanik and
Sydow assert that the evidence is legally insufficient to support the jury’s answer
to the damages question for Sydow’s breach-of-contract claim.

III. Standards
of Review

When reviewing the legal sufficiency
of the evidence, we consider the evidence in the light most favorable to the
challenged finding and indulge every reasonable inference that would support
it. City of Keller v. Wilson, 168 S.W.3d 802, 823 (Tex. 2005).  We must
credit favorable evidence if reasonable jurors could and disregard contrary
evidence unless reasonable jurors could not. See id. at 827. We must
determine whether the evidence at trial would enable reasonable and fair-minded
people to find the facts at issue.  See id.  Jurors are the sole
judges of witness credibility and the weight to give to testimony.  See id.
at 819.

When reviewing a challenge to the
factual sufficiency of the evidence, we examine the entire record, considering
both the evidence in favor of, and contrary to, the challenged finding.  Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).  After considering and weighing
all the evidence, we set aside the fact finding only if it is so contrary to
the overwhelming weight of the evidence as to be clearly wrong and unjust.  Pool
v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986).  The jurors are the
sole judges of the credibility of the witnesses and the weight to be given to
their testimony.  GTE Mobilnet of S. Tex. v. Pascouet, 61 S.W.3d 599,
615B16 (Tex. App.—Houston [14th Dist.]
2001, pet. denied).  We may not substitute our own judgment for that of the
jury, even if we would reach a different answer on the evidence.  Maritime
Overseas Corp. v. Ellis, 971 S.W.2d 402, 407 (Tex. 1998).  The amount of
evidence necessary to affirm a judgment is far less than that necessary to
reverse a judgment.  Pascouet, 61 S.W.3d at 616. 

IV.      Analysis

A.        Attorney-Client Relationship Between
Kormanik and Seghers

In their first issue, Kormanik and Sydow argue that
the evidence is legally and factually insufficient to support the jury’s
finding in response to Question 3 of the jury charge, in which the jury was
asked about the nature of the relationship between Kormanik and Seghers.  At
the charge conference, no party asserted a valid objection to any defect in
this question; therefore, we measure the sufficiency of the evidence against
the standard in this question.  See Tractebel Energy Marketing, Inc. v. E.I.
Du Pont de Nemours & Co., 118 S.W.3d 929, 932 (Tex. App.—Houston [14th
Dist.] 2003, pet. denied).  The jury found that an attorney-client relationship
existed between Kormanik and Seghers at the time of the agreement which
extended to the negotiations and implementation of the agreement.  The trial
court instructed the jury as follows:

An
attorney[-]client relationship is a contractual relationship whereby an
attorney agrees to render professional services.  The relationship may be created
by contract or by the actions of the parties.  There must be a meeting of the
minds as to the relationship determined by an objective standard based upon
what the parties said and did, not determined by the parties[’] subjective
state of mind.

 

In July 2005, Seghers and Kormanik entered into a
written agreement establishing an attorney-client relationship.  Under the
unambiguous language of the written agreement, Seghers paid Kormanik a retainer
of $25,000.  This contract provided, “Client [Seghers] empowers the said
Attorney [Kormanik] to take such actions and to file any legal actions as may
be advisable in Attorney’s judgment with respect to legal services rendered and
to be rendered with regard to the Tikar Art Collection which is currently in Texas
and Africa.”  Under the plain meaning of the written agreement, the $25,000 is
a retainer that must be replenished, and Kormanik will bill Seghers at $250 per
hour, even if these billings exceed $25,000.  

Kormanik testified that he and Seghers orally agreed
to change this agreement into a flat fee of $25,000 rather than a retainer and
billings based upon the hours worked.  Kormanik also testified that he orally
agreed with Seghers to travel with Seghers to Cameroon and to be paid an
additional flat fee of $25,000 for his services and another $25,000 for
expenses.  

After returning from Cameroon in February 2006,
Kormanik continued to render legal services to Seghers regarding the Mbiam
lawsuit.  In April 2006, the releases were executed.  According to a document Kormanik
prepared, Kormanik reviewed documents relating to the dismissal of the Mbiam
lawsuit on June 5, 2006.  Kormanik testified that his attorney-client
relationship with Seghers ended “somewhere in the latter part of June of
2006.”  Kormanik testified that he asked Seghers to send him $20,000, and the
evidence contains emails reflecting that Kormanik requested this $20,000 on or
before June 22, 2006.  Kormanik admitted that he did not send Seghers any
letter terminating his legal representation of Seghers.  Kormanik claimed that
the $20,000 was not sent specifically for legal work, and that Kormanik and
Seghers “had not come to any agreement about what, if anything, [they] were
going to do.”  Kormanik also contended that he asked Seghers to send him
$20,000 because Seghers knew Kormanik did not work for free and Kormanik was
going to set aside his time to visit with Seghers about the marketing plan. 
Sydow did not recall being aware of this $20,000 payment from Seghers to
Kormanik in July 2006.  

Before the July 8, 2006 meeting began, Kormanik had
cashed the June 30, 2006 check for $20,000.  The meetings on July 8 and July
10, 2006 occurred in Kormanik’s Houston law office.  Seghers testified that on
July 10, 2006, he gave Kormanik the check for $110,000, after Seghers placed
the notation “attorney fees” on the check.  A document in evidence supports
Seghers’s testimony in this regard, and Kormanik has no recollection as to
whether the notation was on the check when he received it and cashed it.  Seghers
stated that Kormanik was Seghers’s attorney during the meeting on July 10,
2006, attended by Seghers, Kormanik, and Sydow.  

Seghers testified that he gave
Kormanik the June 30, 2006 check to investigate and pursue action against Mbiam
by the Tikar Foundation or to explore different options.  According to Seghers,
the point of this action was to try to see if the $2.8 million that Mbiam had
received could be used to improve the local infrastructure in Cameroon rather
than for Mbiam’s personal benefit.  Kormanik and Seghers argue that Seghers’
testimony in this regard cannot possibly be true based on the release in the
Mbiam lawsuit.  In this release, Seghers (1) stated that he was the sole and
exclusive owner of the claims in that case and that no assignment had been made
of any portion of these claims to any person, firm, or corporation, and (2)
released Mbiam from any and all claims which arose in any manner from any
transaction by and between Seghers and Mbiam with regard to the Tikar art.  But
this release in no way precludes Kormanik from acting as Seghers’s attorney in
the investigation of a potential action against Mbiam by the Tikar Foundation
or in the exploration of different options.  Further, presuming for the sake of
argument that any suit by the Tikar Foundation against Mbiam would be dismissed
on summary judgment based on the release, Kormanik still could retain an
attorney to investigate the possibility of filing such a lawsuit.  

On its face, the June 30, 2006 check
does not indicate whether it comes from a Tikar Foundation account or from a
Seghers account.  Some evidence indicates that the June 30, 2006 check came
from a Tikar Foundation bank account.[3] 
Other evidence, including Kormanik’s testimony, indicates that this check came
from Seghers’s funds.  The jury reasonably could have credited the evidence
indicating that this $20,000 came from Seghers’s funds.  In any event, even if
the jury concluded that these funds came from a Tikar Foundation account, this
would not mean that any attorney-client relationship relating to these funds
would have to be between Kormanik and the Tikar Foundation.  See Roberts v.
Healey, 991 S.W.2d 873, 880–81­ (Tex. App.—Houston [14th Dist.]
1999, pet. denied).  

Emails that, according to Kormanik,
related to the negotiation or implementation of the marketing plan state that
they were sent by Kormanik acting on behalf of his professional corporation. 
Kormanik testified that, for most of his career, he has been a personal injury
lawyer, that he was not a business lawyer, and that he knows nothing about
marketing art.  The jury impliedly did not credit Seghers’s testimony that
there was no agreement regarding the marketing plan, and there were
inconsistencies and contradictions in Seghers’s testimony.  Nonetheless, the
jury still was free to credit the parts of Seghers’s testimony showing that an
attorney-client relationship existed between Kormanik and Seghers during the
negotiation and implementation of this agreement.  As factfinder, the jury had
the prerogative to believe one witness and disbelieve another, to believe some
parts of a witnesses’s testimony and disbelieve other parts, and to resolve inconsistencies in any witnesses’ testimony.  See Duruji v. Duruji,
2007 WL 582282, at *5 (Tex. App.—Houston [14th Dist.] Feb. 27, 2007, no pet.)
(mem. op.).

The
record contains evidence that would allow reasonable jurors to conclude that
there was a meeting of the minds between Kormanik and Seghers based on what the
parties said and did.  There is evidence that (1) Kormanik and Seghers
discussed a second action against Mbiam; (2) Seghers gave Kormanik the June 30,
2006 check to investigate and pursue action against Mbiam by the Tikar Foundation
or to explore different options; (3) Kormanik asked Seghers to send Kormanik
$20,000, (4) Kormanik cashed the $20,000 check before July 8, 2006; and (5)
Kormanik cashed the July 10, 2006 check with the notation “attorney fees” on
it.  The evidence is conflicting regarding whether an attorney-client
relationship existed between Seghers and Kormanik during the negotiation and
implementation of the marketing agreement.  As the sole judges of the
credibility of the witnesses and the weight to be given to their testimony, the
jury was free to make this determination.  See Pascouet, 61
S.W.3d at 615–16.  

Considering
the evidence in the light most favorable to the challenged finding, indulging
every reasonable inference that would support it, crediting favorable evidence
if reasonable jurors could, and disregarding contrary evidence unless
reasonable jurors could not, we conclude that the trial evidence would enable
reasonable and fair-minded people to find that an attorney-client relationship
existed between Kormanik and Seghers in response to Question 3 in the jury
charge.  See City of Keller, 168 S.W.3d at  823, 827; Bright
v. Addison, 171 S.W.3d 588, 596–97 (Tex. App.—Dallas 2005, pet. denied)
(concluding evidence was legally and factually sufficient to support finding
that attorney-client relationship existed).  Examining the entire record,
considering both the evidence in favor of, and contrary to, the challenged
finding, and considering and weighing all the evidence, we conclude that the jury’s
answer to Question 3 is not so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust.[4] 
See Pool, 715 S.W.2d at 635; Bright, 171 S.W.3d at 596–97. 
Accordingly, we overrule Kormanik and Sydow’s first issue.

B.        Breach of Fiduciary Duty

In their second issue, Kormanik and Seghers argue
that the evidence is legally and factually insufficient to support the jury’s
finding in response to Question 4 of the jury charge relating to Kormanik’s
compliance with his fiduciary duty. At the charge conference, no party asserted
a valid objection to any defect in this question; therefore, we measure the
sufficiency of the evidence against the standard in this question.  See
Tractebel Energy Marketing, Inc., 118 S.W.3d at 932.  In its answer to
Question 4, the jury found that Kormanik did not show he complied with his
fiduciary duty to Seghers.  The trial court instructed the jury that, to show
he complied with his fiduciary duty, Kormanik had to establish each of the
following:

a.
The transaction pertaining to marketing was fair and equitable to [Seghers];

b. 
[Kormanik] made reasonable use of the confidence that [Seghers] placed in him;

c. [Kormanik]
acted in the utmost good faith and exercised the most scrupulous honesty toward
[Seghers];

d. [Kormanik]
placed the interests of [Seghers] before his own, did not

use the
advantage of his position to gain any benefit for himself at the expense of [Seghers],
and did not place himself in any position where his self-interest might
conflict with his obligations as a fiduciary; and

e. [Kormanik]
fully and fairly disclosed all important information to [Seghers] concerning
the transaction.

 

Sydow testified that, under the
agreement with Seghers, Sydow would discuss Seghers’s theories about Tikar
culture and art with Sydow’s “clients on the West Coast” to see if Sydow could
generate interest in these topics.  According to Sydow, the idea was to generate
interest among these clients, which would dramatically enhance the value and
importance of the Tikar art collection.  Sydow testified that he had no
obligation under the agreement to assist Seghers in selling Tikar art to
Sydow’s clients.  Sydow testified that Kormanik was to help Sydow in his
efforts and that Seghers was to pay each of them a $175,000 flat fee that was
not dependent upon the amount of hours worked or the success of the efforts. 
According to Sydow, Kormanik would do whatever Sydow asked him to do to assist in
these efforts.  Sydow stated that Kormanik was going to (1) educate himself
about Seghers’s theories regarding Tikar culture, (2) assist in identifying African
academicians who were going to meet with Sydow’s West Coast clients, if these
clients were interested, (3) prepare the academicians to discuss the Tikar
culture and Seghers’s theories with these clients, and (4) assist in setting up
the meetings and receptions.  

Based upon the trial evidence, the
jury reasonably could have found that, under the July 10, 2006 agreement,
Kormanik, who knew nothing about marketing art, would receive $175,000 in
guaranteed compensation, not dependent on the amount of hours worked or the
success of the efforts.  Kormanik would receive this compensation for assisting
Sydow in his efforts to educate his West Coast clients about Seghers’s theories
about Tikar culture and art and to generate interest in this subject with these
clients.  Given the lack of specificity as to what services Kormanik would be
providing, the lack of any minimum number of hours that Kormanik needed to
work, and the lack of any requirement that Kormanik achieve any benchmark of
success, the jury reasonably could have found that Kormanik failed to prove
that the transaction
pertaining to marketing was fair and equitable to Seghers or that Kormanik placed Seghers’s interests
before his own.  See Keck, Mahin & Cate v. Nat’l Union Fire Ins.
Co., 20 S.W.3d 692, 699 (Tex. 2000) (holding that law firm did not prove as
a matter of law that agreement it negotiated with one
of its clients was fair and reasonable).  Under the applicable standards of
review, we conclude that the evidence is legally and factually sufficient to
support the jury’s finding that Kormanik did not make the showing required
under Question 4.[5] 
See id.  Accordingly, we overrule Kormanik and Sydow’s second issue.

C.  Sydow’s Breach-of-Contract
Damages

            Under their third issue,
Kormanik and Sydow argue that the evidence is legally insufficient to support
the jury’s answer to Question 5, the damages question for Sydow’s
breach-of-contract claim against Seghers.  Because no party asserted a valid
objection to any defect in this question at the charge conference, we measure
the sufficiency of the evidence against the standard set forth in this
question.  See Tractebel Energy Marketing, Inc., 118 S.W.3d at 932.  The
jury was asked “[w]hat sum of money, if any, if paid now in cash, would fairly
and reasonably compensate [Sydow] for his damages, if any, that resulted from
the failure to comply with the agreement?”  The trial court instructed the jury
to consider only the benefit-of-the-bargain measure of damages, which the trial
court defined as follows:  “[t]he difference between the agreed price and the
cost [Sydow] would have incurred in fulfilling the marketing plan.”  The jury
answered “$0.00  (none).”  In this context, the proper interpretation of the
jury’s answer is that the jury found Sydow did not prove by a preponderance of
evidence that he sustained any damages under the measure of damages submitted
by the trial court.  See Sterner v. Marathon Oil Co., 767 S.W.2d 686,
690 (Tex. 1989); C. & R. Transport, Inc. v. Campbell, 406 S.W.2d
191, 194 (Tex. 1966); Gant v. Dumas Glass & Mirror, Inc., 935 S.W.2d
202, 209 (Tex. App.—Amarillo 1996, no writ); Am. Recreational Markets Gen.
Agency v. Hawkins, 846 S.W.2d 476, 478 (Tex. App.—Houston [14th Dist.] 1993,
no writ).  

            Kormanik and Sydow argue
that the evidence conclusively proves that Sydow’s contract damages were
$220,000 based on the uncontroverted liquidated amounts relating to the
agreement.  Presuming for the sake of argument that the evidence conclusively
proved that Seghers was supposed to pay a flat fee of $350,000 to Sydow under
the agreement and that Seghers is entitled to a credit of $130,000,[6]
this would not constitute conclusive proof of Sydow’s damages under Question 5. 
Under the measure of damages in that question the jury still would have to
subtract from that amount the costs that Sydow would have incurred had he fully
performed under the agreement.  See Clear Lake City Water Auth. v. Friendswood
Dev. Co., Nos. 14–07–00404–CV, 14–08–00013–CV,
—S.W.3d—,—, 2011 WL 2150224, at *6 (Tex. App.—Houston [14th Dist.] June 2,
2011, no pet. h.) (stating that “[t]he purpose of the benefit‑of‑the‑bargain
measure of damages is to restore the injured party to the economic position it
would have been in had the contract been fully performed”); Data Foundry,
Inc. v. Silicon Integration Initiative, Inc.,  2010 WL 2336464, at *3 (Tex.
App.—Austin June 11, 2010, no pet.) (mem. op.).  Under the applicable standards
of review, the evidence is legally sufficient to support a jury finding that
Sydow did not prove by a preponderance of the evidence the costs he would have
incurred had he been able to fulfill the marketing plan.  In fact, the record
contains no evidence of the amount of these costs.  

The record contains testimony that
Kormanik and Sydow were planning a trip to California to talk to some of
Sydow’s clients regarding the Tikar art, and both Sydow and Kormanik agreed
that they would have had to pay the costs of talking to and visiting Sydow’s
clients.[7] 
Under the applicable standard of review, the evidence is legally sufficient to
support the jury’s answer to Question 5 and its finding that Sydow did not
prove by a preponderance of evidence that he sustained any damages under the
measure of damages submitted by the trial court.  See Data Foundry, Inc., 
2010 WL 2336464, at *3 (holding that company did not conclusively prove
benefit-of-the-bargain damages and that factfinder appropriately did not find
any damages because company did not offer any evidence of the costs or losses
it avoided by not having to fully perform); Gant, 935 S.W.2d at 209
(holding that the evidence supported jury’s finding, by its zero damages award,
that plaintiff did not meet its burden of proving the damages in question).  Moreover,
because Sydow did not recover on his contract claim, he cannot recover
attorney’s fees under Chapter 38 of the Civil Practice and Remedies Code.[8] 
See MBM Fin. Corp. v. The Woodlands Operating Co., 292 S.W.3d 660, 666
(Tex. 2009).  Accordingly, we overrule Kormanik and Sydow’s third issue.[9]

V.  Conclusion

            The evidence is
legally and factually sufficient to support the jury’s findings that an
attorney-client relationship existed between Kormanik and Seghers at the time
of the marketing agreement and that Kormanik did not
make the showing required to prove that he complied with his fiduciary duty. 
The evidence is legally sufficient to support the jury’s finding that
Sydow did not prove by a preponderance of evidence that he sustained any
contract damages.  Accordingly, we affirm the trial court’s judgment.

 

                                                                                                                                                                                                

                                                                        /s/        Kem
Thompson Frost

                                                                                    Justice

 

 

Panel consists of
Justices Anderson, Frost, and Brown.

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 

 









[1]
A photograph of this white board was admitted into evidence. 





[2]
During some parts of his trial testimony Sydow testified that he never agreed
to market the Tikar art and that he agreed to educate certain celebrities about
Tikar culture rather than to help Seghers sell this art.  





[3] In a June 22, 2006 email, Seghers states “I
sent a check to fund Tikar Foundation today with instructions to send you a
20,000 US$ check.”  This email indicates that the check was drawn on a Tikar
Foundation account after Seghers gave the Foundation $20,000 to fund the
payment of the check. 





[4]
Seghers contends that Kormanik and Sydow failed to preserve error in the trial
court regarding this factual-sufficiency challenge.  Kormanik and Sydow argue
that they did preserve error.  We presume, for the sake of argument, that
Kormanik and Sydow adequately preserved this complaint.  Even so, we conclude
that this complaint lacks merit.





[5]
We presume, for the sake of argument, that Kormanik and Sydow adequately
preserved this factual- sufficiency challenge.  But, in any event, we conclude
that this challenge lacks merit.





[6]
Some evidence at trial indicated that Seghers was supposed to pay $350,000 to
Sydow, who then would pay half of this fee to Kormanik. Other evidence suggests
that Seghers was supposed to pay each man $175,000.  The two payments in question
were made only to Kormanik.   





[7]
Sydow testified that the only costs he incurred
in the few days he was working on this matter were long-distance phone charges
for calls to his clients.  But Sydow did not testify as to the amount of these
costs, and, in any event, the measure of damages in this case is the benefit of
the bargain, not reliance damages. See Clear Lake City Water Auth., 2011
WL 2150224, at *7.

 





[8]
Kormanik also argues that, if this court sustains his first or second issue,
then he should be able to recover under the agreement. We have not sustained
either issue and, in any event, Kormanik could not show that he conclusively
proved his contract damages for the same reasons discussed in this section.





[9]
We need not and do not address Seghers’s argument that Sydow cannot recover on
his contract claim because the agreement was a product of Kormanik’s breach of
fiduciary duty.