**AFFIRM; and Opinion Filed August 28, 2015.**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-13-01118-CV

**LV HIGHLAND CREDIT FEEDER FUND LLC, CHARLES A. WALSH III, THE RUDERMAN FAMILY CHARITABLE FOUNDATION, THE FRIEDMAN FAMILY FOUNDATION, THE LOUIS E. WOLFSON FOUNDATION, BARBARA ROBERTS, AND ABRAM LONDON, Appellants**
**V.**
**HIGHLAND CREDIT STRATEGIES FUND, LP, HIGHLAND CREDIT STRATEGIES FUND, LTD, HIGHLAND CAPITAL MANAGEMENT, LP, HIGHLAND GENERAL PARTNER, LP, JAMES DONDERO, JACK YANG, MARK K. OKADA, AND DONALD J. SALVINO, Appellees**

### On Appeal from the 134th Judicial District Court
### Dallas County, Texas
### Trial Court Cause No. 09-08521

## MEMORANDUM OPINION
Before Justices Lang, Brown, and Whitehill
Opinion by Justice Brown

Appellants sued appellees for various causes of action arising out of appellants' investment in two hedge funds. The trial court granted summary judgment in favor of appellees. In this appeal, appellants bring five issues in which they contend the trial court erred in granting summary judgment. For the following reasons, we affirm the trial court's order granting appellees' motions for summary judgment.

BACKGROUND

Appellee Highland Capital Management, LP, based in Dallas, created and managed two hedge funds – appellee Highland Credit Strategies Fund, LP (the Delaware Fund) and appellee Highland Credit Strategies Fund, Ltd. (the Bermuda Fund) (collectively "the funds").[1] The Delaware Fund was a Delaware limited partnership. The Bermuda Fund was an exempted mutual fund company incorporated under Bermuda law. Appellee Highland General Partner LP is an affiliate of Highland Capital Management and the general partner of the Delaware Fund. The individual appellees, James Dondero, Jack Yang, Mark K. Okada, and Donald J. Salvino, are Highland Capital Management executives. Both the Delaware Fund and the Bermuda Fund invested in nonparty Highland Credit Strategies Master Fund, LP, a Bermuda exempted limited partnership. The Master Fund was structured to allow the Delaware Fund and the Bermuda Fund to pool their respective investments and share in the profits and losses of the Master Fund on a pro rata basis.

The seven appellants all invested in either the Delaware Fund or the Bermuda Fund. Appellant LV Highland Credit Feeder Fund LLC is a Delaware limited liability company with its principal place of business in Boston, Massachusetts. The investments of multiple clients were pooled together to form the Feeder Fund. The Feeder Fund had a partnership interest in the Delaware Fund and invested solely in that fund. The other six appellants, three individuals and three charitable foundations, invested in the Bermuda Fund. The individual appellants, Charles A. Walsh, Barbara Roberts, and Abram London, are Massachusetts residents. The charitable foundations are the Ruderman Family Charitable Foundation, the Friedman Family Foundation, and the Louis E. Wolfson Foundation, all based either in Massachusetts or New York.

---

[1] This background is taken largely from appellants' pleadings.

LongVue Advisors, LLC, not a party in this case, provided investment advisory services and account management services to appellants regarding their investments in the Bermuda Fund and the Delaware Fund. Appellants have alleged that LongVue acted as their agent in dealing with appellees regarding the funds. In addition to being an individual investor in the Bermuda Fund, appellant Walsh is a managing partner of LongVue.

An investor who wanted to withdraw all or part of his investment in one of the funds was required to give written notice. Withdrawals, or redemptions, were processed on a quarterly basis, with a lag time of at least ninety days before a redemption request became effective. An investor wishing to withdraw his investment at the end of a particular quarter was required to give notice by the end of the preceding quarter.

With the financial crisis in 2007-2008, the Delaware Fund and the Bermuda Fund began experiencing significant losses. Appellants became concerned that other investors in the funds would seek to redeem their investments in substantial numbers. They were worried that the funds' ability to successfully execute their long-term investment strategies could be negatively affected if a significant amount of investors withdrew from the funds. They were also concerned that if the funds were forced to liquidate a significant amount of investments on short notice to meet redemption demands, those investors who did not redeem would be left holding the funds' most illiquid investments.

Because of their concerns, in March 2008, LongVue, acting on appellants' behalf, began asking appellees for information regarding the number and amount of investor redemptions in the funds. According to appellants, appellees informed them, on more than one occasion, that redemption requests were not significant. Appellants now contend that, instead of disclosing the true number of redemptions, appellees "concealed the truth about the amount of redemptions and falsely represented that the redemptions were far below their actual level." Appellants contend

that because of appellees' false representations, appellants decided not to submit redemption requests for their investments prior to the end of either the first or second quarter of 2008.

On October 15, 2008, Highland Capital Management sent a letter to investors in the funds informing them it intended to "wind down the investment portfolio in an orderly fashion." It planned to sell off the assets in the portfolio over a projected three-year period and distribute the sales proceeds to investors on a pro rata basis. The claims of investors and creditors exceeded the value of the funds' assets, and disputes arose among investors regarding distribution of those assets. In response, Highland Capital Management proposed a Joint Plan for Distribution for the stated purposes of maximizing recovery for redeemers and avoiding the expense and uncertainty of litigation. That plan favored investors who submitted redemption requests on or before June 30, 2008, and who had not received full payment. These investors were considered Prior Redeemers. The second class of investors, Compulsory Redeemers, was comprised of investors who either never sought to redeem their investments or filed requests effective after September 30, 2008.

In July 2009, appellants sued appellees for various claims, including fraud, breach of fiduciary duty, and violations of Massachusetts's deceptive trade practices and blue sky laws.[2] Appellants' fundamental complaint was that, in reliance on appellees' misrepresentations, they did not request redemption in time to be considered Prior Redeemers instead of Compulsory Redeemers, and consequently their share of the funds' assets was reduced by over $11 million. Appellants maintained that, had appellees revealed the true amount of redemption requests received by the funds, appellants would have redeemed all of their investments before June 30,

---

[2] Appellants pleaded other causes of action, including negligent misrepresentation, unjust enrichment, and rescission. They withdrew some of these claims and are not appealing the dismissal of others.

–4–

2008. The Feeder Fund also contended it made additional investments in the Delaware Fund based on the misrepresentations.

Appellees filed two separate summary judgment motions, a no-evidence motion and a traditional motion. The trial court granted both of appellees' motions without specifying the grounds upon which summary judgment was granted. This appeal followed.

## STANDARD OF REVIEW

We review the trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The standards for reviewing both traditional and no-evidence motions for summary judgment are well established. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex. 1985). A trial court must grant a traditional motion for summary judgment if the moving party establishes that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Nixon,* 690 S.W.2d at 548–49; *see* TEX. R. CIV. P. 166a(c)*.* A no-evidence summary judgment motion is essentially a motion for a pretrial directed verdict. *Timpte Indus.*, 286 S.W.3d at 310. To defeat a no-evidence motion for summary judgment, the nonmovant is required to produce evidence that raises a genuine issue of material fact on each challenged element of its claim. *Rico v. L-3 Commc'ns Corp.*, 420 S.W.3d 431, 438 (Tex. App.—Dallas 2014, no pet.); *see* TEX. R. CIV. P. 166a(i). We consider the evidence in the light most favorable to the nonmovant. *Rico*, 420 S.W.3d at 438. A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). More than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.* at 601. However, when the evidence is so weak as to do

no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Id.*

THE BERMUDA SCHEME OF ARRANGEMENT

We begin by addressing appellants' fourth issue because our resolution of this issue disposes of the claims of all appellants except the Feeder Fund. In their traditional motion for summary judgment, appellees asserted that all claims of the appellants who invested in the Bermuda Fund (Walsh, Roberts, London, the Ruderman Foundation, the Friedman Foundation, and the Wolfson Foundation) were released by a scheme of arrangement that was approved by order of the Bermuda Supreme Court. In their fourth issue, appellants contend the claims of those appellants invested in the Bermuda Fund have not been released.

On March 14, 2013, shortly before they filed their traditional summary judgment motion, appellees filed a notice of filing foreign country judgment, pursuant to chapter 36 of the civil practice and remedies code. The notice was supported by the affidavit of John Honis, an employee of Highland Capital Management. Appellees presented a similar affidavit from Honis in support of their traditional motion for summary judgment. Honis stated that the Bermuda Fund utilized a procedure under Bermuda law providing for a scheme of arrangement. In February 2011, the Bermuda Fund initiated, in the Supreme Court of Bermuda, an application for a scheme of arrangement to liquidate the fund and pay off its creditors in accordance with the Joint Plan of Distribution. The plan had previously been sent to all of the fund's redeemers. At a hearing in March 2011, the Bermuda Supreme Court approved the process by which the scheme of arrangement would be effectuated. Meetings were held in Bermuda to collect votes on the proposed scheme of arrangement, as ordered by the Supreme Court of Bermuda. According to Honis, the required number of creditors voted in favor of the scheme of arrangement. On April 14, 2011, the Supreme Court of Bermuda entered an order approving the

scheme of arrangement, and that order was attached to Honis's affidavit. The order provided that the scheme of arrangement "be and is hereby sanctioned by this Honourable Court so as to be binding upon the Company [the Bermuda Fund] and its Scheme Creditors [Bermuda Fund Redeemers]." The scheme of arrangement, which was attached to the order, provided that the first $30 million available for distribution would be distributed 100% to Prior Redeemers pro rata based on their redemption amounts relative to one another. The next $5,294,117.65 million available for distribution would be distributed pro rata to Compulsory Redeemers who consented to the distribution plan and to a Redeemer Trust Account. All remaining amounts for distribution would be distributed 85% to Prior Redeemers pro rata and 15% to consenting Compulsory Redeemers pro rata and to the trust account. The scheme was to become effective as soon as a copy of the order of the Bermuda Supreme Court sanctioning the scheme was delivered for registration to the Registrar of Companies in Bermuda, as required by the Bermuda Companies Act.

Appellees moved for summary judgment on grounds the following language in the scheme of arrangement released all of the Bermuda appellants' claims:

> Upon the Effective Date, each of the Company Redeemers [both Prior and Compulsory Redeemers] . . . hereby releases the HCM Funds, [and] each of the HCM-Related Parties . . . from any and all accounts, actions, agreements, causes of action, claims . . . and all other liabilities of every kind, nature and description . . . which each Company Redeemer has, may have or ever had against any or all of the HCM Funds, such HCM-Released Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to the HCM Funds . . . .

HCM Funds was defined to mean the Master Fund, the Bermuda Fund, and the Delaware Fund. HCM-Related Parties included Highland Capital Management and Highland General Partner and their officers, directors, and employees. In another section titled, "Moratorium," the scheme of arrangement provided that upon the scheme becoming effective, no redeemer shall be entitled to take any action against the Bermuda Fund "or any other HCM Fund or any HCM-Related Party"

–7–

for any claims in any jurisdiction except in the Bermuda Supreme Court for the purpose of enforcing payment of a distribution the Bermuda Fund failed to pay or as otherwise permitted by the supreme court.

In this appeal, appellants give three reasons why the scheme of arrangement did not release their claims. First, they contend the Uniform Foreign Country Money-Judgment Recognition Act (the UFCMJRA), found in chapter 36 of the civil practice and remedies code, does not apply to the scheme of arrangement. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 36.001-.008 (West 2015). But even if the UFCMJRA does not apply to the scheme of arrangement, chapter 36 does not prevent the recognition of foreign country judgments in situations not covered by the act. It contains a savings clause that allows a court to recognize types of judgments not covered by the UFCMJRA. *Id.* § 36.008; *see Don Docksteader Motors, Ltd. v. Patal Enters., Ltd.*, 776 S.W.2d 726, 728 (Tex. App.—Corpus Christi 1989), *rev'd on other grounds*, 794 S.W.2d 760 (Tex. 1990).

Here, the Bermuda Fund was an exempted mutual fund company incorporated under Bermuda law. A subscription agreement investors in the Bermuda Fund entered into provided that the agreement would be governed by the laws of Bermuda. Further, the Bermuda Fund's bylaws provided that any winding up of the fund would be subject to the Bermuda Companies Act 1981. Section 99 of that act provides a method by which a company and its creditors may agree to a "compromise or arrangement." BERMUDA COMPANIES ACT 1981 § 99. It provides that "If a majority in number representing three-fourths in value of the creditors . . . voting either in person or by proxy at the meeting, agree to any compromise or arrangement, the compromise or arrangement shall if sanctioned by the Court, be binding on all the creditors . . . ." *Id.* § 99(2). Appellees presented summary judgment evidence that the scheme of arrangement in this case, which released all fund-related claims of all redeemers in the Bermuda Fund, was approved by

order of the Supreme Court of Bermuda in accordance with the Bermuda Companies Act and thus became binding on appellants. The trial court did not err in granting summary judgment for appellees on this basis.

Further, even if appellees needed to use the UFCMJRA to enforce the order approving the scheme of arrangement, appellants' argument about the applicability of the act lacks merit. Appellants' sole argument regarding the applicability of the UFCMJRA is that scheme of arrangement does not meet the definition of a "foreign country judgment" found in the act. *Id.* § 36.001(2). A "foreign country judgment" means a judgment of a foreign country granting or denying a sum of money, with certain exceptions not applicable here. *Id.* Appellants contend the scheme does not meet this definition, characterizing it as a "roadmap by which the assets of the Bermuda Fund will, at a later time, be distributed."

Here, the scheme of arrangement provided that the first $30 million available for distribution will be distributed to Prior Redeemers pro rata. Under the scheme, the next $5,294,117.65 available will be distributed pro rata to Compulsory Redeemers who consented to the distribution plan and to a Redeemer Trust Account in an amount equal to the pro rata share of the redemption amounts of the Compulsory Redeemers who did not consent to the plan. Further, the scheme required Highland Capital Management to pay $3 million into a Contribution Trust Account and pay an additional $6 million into the account on the third anniversary of the scheme's effective date. The trust accounts would be used if necessary to pay any costs associated with claims asserted by any non-consenting Compulsory Redeemers. After all such claims were resolved, any amounts remaining in the either trust account were to be distributed to the redeemers. Although the payment of money to creditors under the scheme would take place as the assets became available for distribution, the order approving the scheme nevertheless grants a sum of money and thus the UFCMJRA applies.

Second, appellants contend that even if the scheme of arrangement is a foreign country judgment, it does not release the Bermuda appellants' claims. Appellants contend there was an exception in the document for damages, losses, or claims arising from acts of fraud, gross negligence, or willful misconduct. They refer to the following provisions of the scheme:

6.2.1    The [Bermuda Fund] . . . shall neither have nor incur any liability to any person or entity (including any holder of a Claim) for any act taken or omitted to be taken *in connection with or related to or in contemplation of*

6.2.1.1 the negotiation, formulation and preparation of the Scheme, or any related agreements, instruments or other document;

6.2.1.2 the formulation, negotiation, preparation, dissemination, implementation, administration or confirmation of the Scheme, Explanatory Statement or other associated documents or the occurrence of the Effective Date or the Explanatory Statement; or

6.2.1.3 any contract, instrument, release or other agreement or document created or entered into in connection with the Scheme;

provided that the foregoing exculpations shall not extend to any damages, losses or claims arising from acts of fraud, gross negligence or willful misconduct. [Italics added; underscoring in original.]

The plain language of this provision allows a party to bring a fraud claim only "in connection with or related to" the negotiation and formulation of the scheme of arrangement and related documents. Appellants' fraud claims are not related to the manner in which the scheme of arrangement was prepared. Thus, the release in the scheme does not exclude the Bermuda appellants' fraud claim.

Third, appellants contend that under Texas law the release does not extinguish their fraud claim because the release does not specifically mention fraud. Appellees respond that Texas law does not govern the scheme of arrangement. Even if Texas law were to apply to the Bermuda scheme of arrangement, Texas permits broad-form releases. *See Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 698 (Tex. 2000). A release must "mention" the claim to be effective, but there is no requirement that the parties anticipate and identify each potential cause

–10–

of action relating to the release's subject matter. *Id.* Here, the scheme released the Bermuda fund, the Delaware fund, and Highland Capital Management-related parties from the redeemers'/investors' causes of action or claims "related to the HCM Funds." This was sufficient mention of appellants' fraud claim. *See id.* (release covering "all demands, claims or causes of action of any kind whatsoever" attributable to rendition of legal services encompassed legal malpractice claims); *cf. Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938–39 (Tex. 1991) (release of claims against bank related to specified loan transaction did not release claims arising out of another transaction with bank). We conclude appellants' arguments under this issue are without merit. The trial court could have properly determined that all claims of the Bermuda appellants were released. We overrule appellants' fourth issue.

## FRAUD

Because the Feeder Fund is the only appellant whose claims were not released by the scheme of arrangement, we turn to the remaining issues as they relate to that appellant, although they were brought by all appellants. In the first issue, the Feeder Fund contends, among other things, that the trial court erred by granting appellees' no-evidence motion for summary judgment as to the fraud cause of action. In their no-evidence motion, appellees asserted the fraud claim should be dismissed because there was no evidence of any of the four elements of fraud: (1) the defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly without any knowledge of its truth when made; (3) the defendant intended to induce the plaintiff to act on the representation; and (4) the plaintiff acted in reliance on the representation and thereby suffered injury. *See Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011). The Feeder Fund then bore the burden to "point out" more than a scintilla of probative evidence concerning each element.

–11–

*See MaximusAlliance Partners, LLC v. Faber*, No. 05-13-01688-CV, 2015 WL 707033, at * 8 (Tex. App.—Dallas Feb. 17, 2015, no pet.) (mem. op.).

As the basis for its fraud claim, the Feeder Fund contends appellees made five separate misrepresentations regarding the extent of redemptions. Four of the five alleged misrepresentations were made by appellee Salvino, a client relationship manager for Highland Capital Management, to Bruce Stewart, who worked for LongVue. The Feeder Fund contends appellees made the following misrepresentations:

1. March 2008 misrepresentations in the press regarding the extent of redemptions. In a *Financial Times* article titled, "Highland threatened by tumbling debt prices," appellee Yang was quoted as stating that so far redemptions "haven't been significant." In a *Bloomberg* article titled, "Highland Raises $1 Billion to Buy Bank Debt, CDOs," appellee Okada stated that "investor requests to withdraw funds have been minimal."

2. A March 7, 2008 misrepresentation concerning the extent of holdbacks imposed by the funds in connection with redemptions. Stewart asked Salvino in an email: "If a client put in a redemption request, is Highland holding back any part of the ending mkt value outside of the 10% or so holdback?" (Stewart explained in his deposition that if the funds were beginning to experience any liquidity constraints, Highland Capital Management would have been holding back more than ten percent.) Salvino responded, "I am not aware of any additional holdback other than the traditional holdback for year end."

3. A March 7, 2008 misrepresentation that the funds "had not seen many redemptions at all." Stewart telephoned Salvino to ask if the funds had received redemption requests in an amount greater than three percent of the funds' asset value. Salvino allegedly replied that the funds "had not seen many redemptions at all" and characterized redemptions as "almost a non-event." Salvino also promised to keep Stewart "in the loop" and to give him a "heads up" if the

–12–

value of the funds' assets under management started to be materially impacted by redemptions. Salvino never did so.

4. Another misrepresentation that redemptions were almost a "non-event." On April 15, 2008, Stewart again asked Salvino over the phone if the funds had received redemption requests amounting to more than three percent of the funds' asset value. Salvino allegedly reassured Stewart that redemptions were almost a non-event.

5. A June 13, 2008 misrepresentation that redemptions were "fairly light." Salvino emailed Stewart asking for the amount of redemptions per quarter for 2007 and for the first quarter of 2008 and projected redemptions for the remaining quarters of 2008. Salvino responded, "We don't provide detail related specifically to inflows or redemptions in our funds. That said they were fairly light given the market conditions and we did take in a good bit of money to offset some of the outflows." In turn, Stewart asked if any of the outflows were ever greater than three percent of the assets under management. Salvino responded, "[I]t would have been close to 3%+- in one or two Q's."

The Feeder Fund maintains that by March 2008, Highland Capital Management knew that its outstanding unpaid redemptions amounted to about 50% of the funds' net asset value.[3] The Feeder Fund alleges that Highland Capital Management's misstatements about redemption rates were intended to cause, and did cause, LongVue not to instruct its clients in the first quarter of 2008 to redeem their investments in the funds. As such, the Feeder Fund was deemed a Compulsory Redeemer instead of a Prior Redeemer.

It is undisputed that appellees did not make any statements regarding redemption rates directly to the Feeder Fund, or to any appellant. Two statements were made in newspaper

---

[3] Appellees dispute that redemptions amounted to 50% of the funds' net asset value. They maintain that without evidence of the number of new investments in the funds, appellants cannot show the representations were false.

articles, and the others were made to Stewart, who worked for LongVue. And the evidence shows that LongVue did not speak to any appellant about the redemption rates before Highland Capital Management announced it was winding up the funds. The Feeder Fund contends direct communications were not necessary because LongVue was its agent and that fraud upon an agent is considered fraud upon the principal. We need not decide the issue of agency however, because even if we assume LongVue was the Feeder Fund's agent, there is no evidence of the reliance element.[4]

A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting, to his detriment. *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East, Inc.*, 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.). In its response to appellees' motions for summary judgment, the Feeder Fund's reliance argument was that Stewart would have withdrawn the Feeder Fund's investments in the Delaware Fund if he had known the truth about the extent of redemptions. Walsh, an appellant and co-founder of LongVue, testified in his deposition that the clients had the ultimate authority on whether to take their money out of a fund. He further indicated that while "our documents" gave LongVue discretion to redeem for a client, LongVue always consulted with the client before redeeming a client's interest. Randy Hustvedt, who founded LongVue with Walsh, also testified that the investors had the ultimate say on whether to redeem. Stewart gave similar testimony about LongVue always ensuring it had the client's approval before making a redemption request. The Feeder Fund now asserts that LongVue relied on the misrepresentations by failing to advise its clients to get out of the funds.

---

[4] Appellees also argued in their appellate brief, for the first time, that appellants' fraud claims are "holder" claims because appellants alleged appellees' misrepresentations tricked them into holding their investments, as opposed to making an investment. Appellees contend such holder actions have not been recognized in Texas, and if they are permissible, they must meet a heightened standard of pleading and proof. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 926–30 (Tex. 2010). Because the Feeder Fund's fraud claim fails even under the regular elements of fraud, we need not consider this argument.

–14–

But LongVue's failure to advise the Feeder Fund to redeem does not alone show that the Feeder Fund relied to its detriment. Under these facts, the Feeder Fund needed to show that, but for the alleged misrepresentations, it would have redeemed its investments by June 30, 2008, in order to become a Prior Redeemer. Without such evidence, any harm to the Feeder Fund is purely speculative.

As evidence that it would have redeemed its investments, the Feeder Fund points to deposition testimony from Stewart and Walsh. Stewart testified in his deposition that, had he known what the redemption rates were in 2008, he would "most likely" have told his clients to redeem in "the March, February time frame." Stewart further testified that, had LongVue made a recommendation to its clients to get out in February or March of 2008, "most likely most of our clients would have made some redemption requests." Stewart did not have any conversations with clients about what they would have done in the spring of 2008 had they known the actual rates of redemptions. Thus Stewart speculated about whether he would have told his clients to redeem and whether they would have actually redeemed.

Walsh testified that, had he known the actual redemption rates, as an individual investor, he would have redeemed.[5] Walsh also testified, "I think LongVue would have" redeemed out of the funds if Highland Capital Management released the correct amount of redemption rates in March 2008. When asked if he could think of any reason an investor would not have redeemed at that time knowing the true rates, Walsh replied, "I'm sure there's always one." Since LongVue did not withdraw its investors' interests without approval from them, it is unclear who Walsh was referring to in stating he thinks LongVue would have redeemed out of the funds. There were more than twenty-five investors whose investments were pooled together in the

_____

[5] Appellant Roberts, who invested in the Bermuda Fund, testified in her deposition that she did not consider redemption rates to be information material to her investment decisions.

–15–

Feeder Fund. Walsh indicated in his deposition testimony that these investors could act individually to take their money out of the Delaware Fund. If one investor in the Feeder Fund requested redemption, the other investors in the Feeder Fund were not notified because, according to Walsh, those were "individual decisions made by the clients." Even if Walsh's testimony could be construed to refer to the Feeder Fund, his testimony about whether any particular investor would have redeemed was speculative, as was Stewart's. Mere speculation or conjecture cannot defeat summary judgment. *See Kiger v. Balestri*, 376 S.W.3d 287, 295 (Tex. App.—Dallas 2012, pet. denied). There is no probative evidence that, had LongVue known the true amount of redemptions and made a recommendation to redeem, the Feeder Fund, or any of its individual investors, would have submitted a redemption request in time to be considered a Prior Redeemer. Thus, there is no evidence that the Feeder Fund relied to its detriment on appellees' alleged failure to disclose the true amount of redemptions. Nor is there any evidence that the Feeder Fund would not have made additional investments in the Delaware Fund if it had known of the redemption rates.

Further, there is no evidence in the record to indicate that the Feeder Fund (or its alleged agent LongVue) was aware of the statements Okada and Yang made in the press. There is therefore no evidence the Feeder Fund acted or omitted to act in reliance on these particular statements. We overrule appellants' first issue.

### APPELLANTS' REMAINING CLAIMS

In its second issue, the Feeder Fund contends the trial court erred in granting summary judgment as to its breach of fiduciary duty claims. In its third issue, it contends the trial court erred in granting summary judgment in favor of appellees on the Feeder Fund's Massachusetts statutory claims for deceptive trade practices and blue sky law violations. Our conclusion that the Feeder Fund has not presented any evidence it would have redeemed its investment (or

–16–

refrained from investing further) had it known the true rate of redemptions also resolves the Feeder Fund's issues related to these claims.

In its original petition, the Feeder Fund set out eight ways in which appellees allegedly breached their fiduciary duties. The Feeder Fund alleged that as a result of appellees' breach of fiduciary duty, it suffered substantial monetary damages. On appeal, the Feeder Fund challenges the court's summary judgment on this claim only as it involves the alleged misrepresentations set forth above. Appellees moved for no-evidence summary judgment on grounds the Feeder Fund had no evidence of: a fiduciary relationship between it and appellees,[6] a breach of that fiduciary duty, or any injury resulting from the breach.[7]

The Feeder Fund's claims for violation of the Massachusetts deceptive trade practice statute and blue sky law are also based on the same five misrepresentations. The deceptive trade practices claim was brought against only Highland Capital Management. The blue sky law claim was brought against the funds, Highland General Partner, and Highland Capital Management. In their no-evidence motion, along with the other elements of these claims, appellees asserted the Feeder Fund could not prove: (1) a violation of the deceptive trade practices statute because there was no evidence of a causal connection between appellees' deceptive acts and the Feeder Fund's injury; or (2) a violation of the blue sky law because there was no evidence particular

---

[6] We note this Court has previously determined, in another case involving Highland Capital Management and an investor in the Bermuda Fund, that Texas law does not recognize a formal fiduciary relationship between an investor in a hedge fund and the hedge fund's investment manager. *Mary E. Bivins Found. v. Highland Capital Mgmt. L.P.*, 451 S.W.3d 104, 113–14 (Tex. App.—Dallas 2014, no pet.). Appellants pleaded an informal breach of fiduciary duty in this case.

[7] Appellees cited a Texas case for these elements, *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). The Feeder Fund asserts Delaware law governs this claim, and appellees seem to agree with this proposition in their brief. The Feeder Fund indicates there are only two elements of a breach of fiduciary claim under Delaware law: duty and breach. *See In re Mobileactive Media LLC*, 2013 WL 297950, at *21 (Del. Ch. Jan. 25, 2013). Under Delaware law, nominal damages may be recovered for breach of fiduciary duty in certain circumstances. *See O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 917 (Del Ch. 1999). The Feeder Fund alleged in its petition it suffered substantial monetary damages as a result of appellees' breach of fiduciary duty. Under these circumstances, the Feeder Fund must establish the breach caused its damages. *See id.* at 917–19.

appellees offered or sold a security by making an untrue statement of material fact or omitting to state a material fact.[8] *See* MASS. GEN. LAWS ch. 93A, §§ 2, 11; *id.* ch. 110A, § 410(a)(2).

As explained above in connection with its fraud claim, the Feeder Fund has not produced any evidence that it took, or would have taken, any action regarding its investments had it known the redemption rates or been advised by LongVue to redeem. As such, the Feeder Fund has no evidence any breach of fiduciary duty resulted in injury to it, no evidence of a causal connection between any deceptive act and its injury, and no evidence appellees induced the sale of any securities through any untrue statements. We overrule the Feeder Fund's second and third issues.

In light of our resolution of these issues, we need not reach the Feeder Fund's fifth issue in which it challenges appellees' assertion that the Feeder Fund lacked capacity to assert any claims.

We affirm the trial court's order granting appellees' motions for summary judgment.

/Ada Brown/
ADA BROWN
JUSTICE

131118F.P05

---

[8] Further, the Feeder Fund has not properly briefed that portion of its third issue related to the blue sky law cause of action. Although it mentions the blue sky law claims in the "issues presented" section of its brief, its argument regarding this claim is presented only in two footnotes in its brief – one addressing the no-evidence motion and another addressing the traditional motion. Regarding the no-evidence summary judgment, the Feeder Fund says it produced more than a scintilla of evidence on each of the elements of this claim, but includes no record references to direct us to that evidence in the record. *See* TEX. R. APP. P. 38.1(i) (brief must contain clear and concise argument for the contentions made, with appropriate citations to the record).



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

LV HIGHLAND CREDIT FEEDER FUND
LLC, ET AL, Appellants

No. 05-13-01118-CV          V.

HIGHLAND CREDIT STRATEGIES
FUND, LP, ET AL, Appellees

On Appeal from the 134th Judicial District
Court, Dallas County, Texas
Trial Court Cause No. 09-08521.
Opinion delivered by Justice Brown. Justices
Lang and Whitehill participating.

In accordance with this Court's opinion of this date, the trial court's order granting appellees' motions for summary judgment is **AFFIRMED**.

It is **ORDERED** that appellees HIGHLAND CREDIT STRATEGIES FUND, LP, HIGHLAND CREDIT STRATEGIES FUND, LTD, HIGHLAND CAPITAL MANAGEMENT, LP, HIGHLAND GENERAL PARTNER, LP, JAMES DONDERO, JACK YANG, MARK K. OKADA, AND DONALD J. SALVINO  recover their costs of this appeal from appellants LV HIGHLAND CREDIT FEEDER FUND LLC, CHARLES A. WALSH III, THE RUDERMAN FAMILY CHARITABLE FOUNDATION, THE FRIEDMAN FAMILY FOUNDATION, THE LOUIS E. WOLFSON FOUNDATION, BARBARA ROBERTS, AND ABRAM LONDON.

Judgment entered this 28th day of August, 2015.